HENRY WOLFF ET AL., Appellants, *v.* CONNECTICUT MUTUAL LIFE INSURANCE COMPANY, Respondent.

### February 5, 1878.

A life-insurance policy contained a clause that "if the assured shall die by suicide, or in consequence of the violation of any law, * * * or shall be convicted of a felony, the policy shall become void." The assured was killed while in the act of committing an unprovoked assault upon another, under circumstances which rendered the killing justifiable homicide. *Held,* that the death having resulted in consequence of the commission, by the assured, of a crime, the character of which directly increased the risk, there could be no recovery on the policy; and this, though the crime may have been beneath the grade of a felony.

APPEAL from St. Louis Circuit Court.
*Affirmed.*

J. D. JOHNSON, for the appellants, cited: *Harper* v. *Insurance Co.,* 18 Mo. 111; 19 Mo. 509; *Overton* v. *Insur-*

*ance Co.*, 39 Mo. 125 ; *Young* v. *Insurance Co.*, 4 Big. Life Ins. Cas. 5 ; *Georgia, etc., Insurance Co.* v. *Kinnear*, 5 Cent. L. J. 127 ; Broom's Leg. Max. 588, 593.

LEE & ADAMS, for respondent, cited : *Bigelow* v. *Insurance Co.*, 3 Otto, 284 ; *Insurance Co.* v. *Leaver*, Wall. 531 ; *Pavey* v. *Burch*, 3 Mo. 447 ; *Hovey* v. *Pitchen*, 13 Mo. 191 ; *Pitchen* v. *Hovey*, 16 Mo. 436 ; *Insurance Co.* v. *Tweed*, 7 Wall. 44.

BAKEWELL, J., delivered the opinion of the court.

This is an action on a policy of insurance issued on the life of Waldroth Wolff. There was a verdict and judgment for defendant ; and plaintiffs appeal. The answer admits the material allegations of the petition, and sets up, by way of defence, that the policy contains a condition that it is to be void if the assured die in consequence of the violation of law, and says that the assured was killed by one Fritz Kahli, in self-defence, whilst the assured was committing an unlawful assault on Kahli. This is denied by the replication.

The clause in the policy containing the condition is textually as follows : " If the assured shall die by suicide, or in consequence of his violation of any law ; or if he shall become so far intemperate as to impair his health, or induce *delirium tremens;* or if he shall be convicted of a felony, then, and in each and every of the foregoing cases, the policy shall become null and void."

The evidence is that, on the last day of the year 1874, the deceased and several of his neighbors, farmers in the American Bottom, a few miles east of St. Louis, had been out together on a frolic. After midnight, they came to the house of a common friend, one Koenmann, who invited them in, and began to set out food and drink to entertain them. In the back room, Mrs. Koenmann was in bed ; the door between the two rooms was open, and Kahli, in answer to a remark of Mrs. Koenmann, walked into the back room and stood there talking to her. The deceased followed him

into the back room, and called out to Koenmann that Kahli was taking improper liberties with his wife; Koenmann said he was not afraid, and called them to sit down to supper. At the table, the deceased charged Kahli with improper intimacy with the wives of his neighbors generally. The rest of the party remonstrated with the deceased, but he continued his accusations. Kahli became very much depressed, and began to cry. The deceased applied opprobrious names to the company in general, and proposed to fight. Kahli and he went out to fight, but returned without doing so. The other men at last succeeded in getting the deceased to leave with them, for the purpose of going home. Kahli and Koenmann were left alone in the house, and remained there talking for about a quarter of an hour. Kahli then put on his overcoat and his deerskin gloves, and took his gun, which he had carried with him for the purpose of making a noise by way of celebrating New Year's eve. He went out to go home, carrying the gun over his left shoulder. The deceased and two other men of the party, who had acted as peace-makers, were at the time standing together at the end of a passage seven feet wide which led out of Koenmann's premises, and along which Kahli passed on his way out. It was a dark night, and Kahli, coming out of the lighted room, could see nothing. He did not know the men were there. He was grumbling to himself; and as he approached the deceased, he uttered the words, "son of a bitch." Deceased raised his arm, uttering a threat at the time, and grasped Kahli by the throat, pushing him against the fence. Deceased was a larger man than Kahli; he held Kahli by the throat, so that he could not cry out. Kahli's arms were free, and he struck deceased with the butt of his gun on the side of the head. Deceased immediately fell. He was stunned by the blow, and died from its effect. The hammer of the gun had penetrated the skull. The whole affair was the work of a few seconds. Precisely how the blow was struck does not clearly appear. Kahli's statement is, that the deceased had

him by the throat when the blow was given; that the arms
of Kahli were outside the arms of the deceased; and that
the barrel of the gun catching in the cap of the fence
afforded a leverage which gave force to the blow. The only
other witness who speaks to the point, professes to have
been unable to see precisely how the blow was given, but
says the gun was lifted in the air just before Wolff fell.

No question arises, however, as to the facts. The jury
were instructed that, to find for the defendant, they must
believe from the evidence that Wolff assaulted Kahli with-
out provocation; that he attempted to commit a violent
injury upon the person of Kahli; that he had ability to do
so, and that he was actually making such attempt when he
received from Kahli a blow which resulted in his death.
It is not disputed that there was some evidence to support
these four propositions. If these facts existed, Wolff was
committing a misdemeanor under the laws of Illinois, as
was shown by the statutes of that State introduced in evi-
dence. He was also committing an offence at common
law.

The only question for our determination arises upon the
construction of the clause in the insurance policy above set
forth. It is not necessary to set out the instructions given
and refused. If the "violation of law" spoken of in the
insurance policy must be construed to be a felony, the
instructions given were wrong. If it may be construed to
mean a misdemeanor, the instructions given were unexcep-
tionable, and there was no error in refusing those which the
court declined to give; and, our attention being called to
no other error in the record, the judgment in that case must
be affirmed.

A similar question has arisen in this State upon insur-
ance policies containing a clause of the same character
as the one before us. The case of *Harper* v. *Insurance
Company* was twice before the Supreme Court. 18 Mo.
109; 19 Mo. 566. It was there decided that the words,

"if the insured die in consequence of a duel, or by the hands of justice, or in violation of any known law of the State," used in a policy, exclude the idea of death in consequence of any offence below the grade of felony. It was said that the words "any law of this State" must be known from the company in which they are found, and as no offence below the grade of felony is spoken of, they must be taken to mean a felonious offence. In the subsequent case of *Overton* v. *Insurance Company*, 39 Mo. 122, it does not appear that any light was thrown by the context upon the words used. The words of the clause, so far as they appear in the opinion of the court, are: "In case the assured should die in the known violation of any law of this State, or of the United States, or of any government where he may be, this policy shall be void." The Supreme Court declares the principles involved in the two cases to be identically the same; that the reasoning in the one case must be applied to the other; and that, if the deceased died in the commission of any act which would have been justifiable homicide had he killed the man at whom he fired, this was not a violation of the law within the meaning of the policy. It does not, however, distinctly appear in that case that the deceased was guilty of any violation of law whatever at the time he was killed. It was claimed by counsel for respondent that the policy was not forfeited unless deceased, in the *rencontre* in which he was killed, was guilty of a felony; but it does not appear from the statement of facts that the point was in the case, and it cannot be said to have been passed upon by the court.

The case of *Borradaile* v. *Hunter*, 5 Man. & G. 639, arose upon a policy which was to be void if the insured should "die by his own hands, by the hands of justice, or in consequence of a duel." The case was most carefully considered. The facts were that the assured threw himself into the river with the purpose of self-destruction, knowing what he was doing, but being at the time incapable of distin-

guishing between right and wrong. The chief justice held that the words, taken with the context, must be intended of a felonious killing, and that plaintiff ought to recover ; and that, as the words are ambiguous, they must be taken most strongly against the speaker. But the majority of the court held that whilst the words, in the largest sense, would comprise many cases not within the meaning of the parties to the contract, yet that the reasonable construction is that they meant to protect the insured against the temptation to self-destruction offered by the policy itself; and that one incapable of distinguishing right from wrong, though he could not commit a felony, might yet shorten his life with a view to found a claim upon the policy. It was held that the clause must receive a reasonable construction according to the intention of the parties ; that the words are plain, and no limitation should be induced upon them ; and that a guiltless suicide avoided the policy equally with one that involved felonious self-destruction. This case was followed in Massachusetts. *Dean* v. *Insurance Co.*, 4 Allen, 106. But in New York a different conclusion is arrived at ; not, however, without dissent from several of the most learned judges of the Court of Appeals. 4 Hill, 74 ; 4 Seld. 299.

*Cluff* v. *Insurance Company*, 13 Allen, 308, was a suit upon a policy providing that it should be void " in case the assured die by his own hands, in consequence of a duel, by reason of interference, by the hands of justice, or in known violation of any law of these States, of the United States, or of any country in which he may be permitted to be." The assured died in the act of committing a criminal assault. The court applies the maxim of *noscitur a sociis* to the interpretation of the clause, and says that the clause ought not to be interpreted to work a forfeiture unless the intention is apparent, and that the words do not extend to mere trespasses against property, or other infringements of

the civil laws, to which no criminal consequences are attached; that the death must have been occasioned by a criminal act on the part of the deceased, so that death occurred by reason of the guilty act; that there must have been a crime which did actually produce death, or the policy is not avoided; and that an unjustifiable assault and battery is a crime at common law, and will be presumed to be a crime wherever committed.

The very same case, on precisely the same facts, founded on the same occurrence, was decided in New York four years subsequently to the Massachusetts decision. *Bradley* v. *Insurance Co.*, 3 Lans. 347. The judgment for the defendant was affirmed. The court expresses its dissent from the views expressed in the Massachusetts case, limiting the violation of law to criminal acts, and construes the exception as intended to prevent the assured from doing any act, though a mere trespass, in violation of law, which would naturally lead to a conflict endangering life. The same view is entertained by the Supreme Court of the United States, and expressed by Mr. Justice Miller in *Insurance Co.* v. *Seaver*, 19 Wall. 531. In that case the deceased was killed in an illegal horse-race, and the policy prohibits " duelling, fighting, or other breach of the law." The general words, being in company with one which does not import a felony, are considered to be restrained to such illegal acts as naturally and usually result in personal injury, whether or not they be such as, in ordinary language, we understand when we speak of crimes.

It is contended by appellants that " *noscitur a sociis* " must be applied in construing the words of the clause in the contract before us, and that, therefore, the " violation of law " must be a felony. It may be questioned whether the maxim will warrant the construction. Drunkenness is not a felony; and though suicide is a felony at common law, it cannot be said to be so in Missouri, under the altered cir-

cumstances in which we are placed, forfeiture of estate and corruption of blood being abolished, and there being absolutely no punishment for the crime.

We must conclude that contracting parties mean what they say. The largest sense in which the words of this proviso can be taken must confessedly be excluded, or we should reach conclusions manifestly absurd; but it does not follow, therefore, that they should be so restricted as to exclude a case within the apparent object for which they are used. Ought they not to be fairly construed to include all violations of law, at least, which are really crimes, and which directly tend to increase the risk against which the defendant insures? Can they be so construed as to exclude such crimes of violence, though not felonies, as no man in this western country ever commits without taking his life into his own hands? One who springs upon another and clutches his throat, without warning, in the dark, knows that the assault will be repelled with any weapon which the assailed party can most effectively use. To insure one against risks to life arising from such felonies as he may commit would be absurd. The contract, if written ' out, would be void. Why, then, shall it be implied? It was long ago decided that, in the absence of any provision to that effect, a felonious act resulting in death avoids a policy of life insurance. *Amicable Society* v. *Fauntleroy*, 2 Dow. & C. 1; 4 Bli. (N. s.) 194.

In seeking to ascertain the real meaning of the parties to this contract, we must gather it from their words, which are by no means to be strained beyond their fair grammatical import; but we must give some weight to the practical results which follow this or that construction. These results must have been in the minds of the parties. The insurers, of course, had no idea of erecting a barrier against crime, in the interests of the general public. It was nothing to them, more than to the community at large, that the insured might pick a pocket or forge a bank-note; these may be

felonies, but they involve no risk of life; whilst offences against the person, though below the grade of felony, very often involve that risk in the State of Illinois, where the contract was made, and generally, perhaps, throughout the United States.

So far as adjudicated cases go, outside of our own State, their weight is against the claim of plaintiff. In Missouri, there is no case directly in point; and though there are *dicta* of Judge Scott, in *Harper* v. *Insurance Company*, 19 Mo. 510, which seem, perhaps, not entirely in accord with the construction which we put upon this clause, they will be found, on examination, to be by no means irreconcilable with the view of the law which we desire to express.

Whilst maintaining that the expression, "violation of any law," taken with its context in the policy under consideration, is not to be confined to felonies, we are not to be understood as extending it to every misdemeanor of the nature of, or calculated to provoke, a breach of the peace. We are dealing with the case before us, in which deceased met his death whilst committing a crime below the grade of felony, but of such a nature as to render the killing of him a clear case of justifiable homicide; and we hold that such a case is within the meaning of the proviso. We do not say that if one, provoked by some bitter insult, should strike another with his open hand, and be shot down in the act, which is the case suggested by Judge Scott, he would incur thereby the forfeiture of a policy containing such a clause as that before us, and what we have said does not contradict the view that in such policies the insurer contemplates, and is not to be supposed to intend to exclude, the risks arising from some sudden outburst of passion, such as ordinary men are subject to; but we say that the violation of law spoken of is intended to be, not a mere trespass, but what may fairly be denominated a crime; and that when such an offence is committed, whether a felony or not, it will avoid the policy if death ensues as the probable consequence of

the act, under circumstances which make the killing of the assured justifiable homicide.

For myself, I confess I have had much doubt in the case. But the conclusion at which, in common with my brother judges, I have arrived has been reached after careful consideration, and the examination of every judicial interpretation of any similar provision which I have been enabled to discover with diligent search. The case is not free from difficulty; but I have, in the course of investigation, become satisfied as to the meaning of the clause, and I unhesitatingly conclude that the violation of the law which would avoid this policy, according to the true meaning of the parties, to be gathered by the aid of the settled rules of construction from the clause before us, must be held to mean not necessarily a felony; and that the assault shown by the evidence, and by the jury found to have been committed, and in consequence of which the assured died, was within the meaning of the proviso we have been considering; and that the policy is, therefore, void.

The judgment of the Circuit Court is affirmed. All the judges concur.