Filed June 24, 1884.

---

No. 11,104.

## The Terre Haute and Indianapolis Railroad Company *v.* Buck, Administratrix.

Negligence.—*Railroad.*—*Carriers of Passengers.*—*Injuries Resulting in Death.* —*Proximate Cause.*—Where an injury to a passenger, caused by the negligence of the carrier, is such as to render the system of the injured man liable to take on disease and to so enfeeble the system as to make it less likely to resist the inroads of the disease when it does set in, and death results, the death is, in legal contemplation, attributable to the negligence of the carrier.

Same.—*Intervening Agency.*—Where the result of an injury is such as might have been expected to occur in the ordinary or natural course of events, the carrier is not relieved from responsibility although there may have been some intervening agency contributing to the result.

Same.—*Duties.*—*Degree of Care Required.*—A carrier of passengers is held to the exercise of the highest degree of care to secure the safety of passengers, and is liable to a passenger who is himself without fault, for an omission or failure to exercise this care.

Same.—*Duty to Stop Trains at Stations.*—A carrier of passengers is bound to

The Terre Haute and Indianapolis R. R. Co. *v.* Buck, Administratrix.

provide reasonably safe places for passengers to alight from trains, and is bound to stop at regular stations for a sufficient length of time to permit passengers, using reasonable care, to alight with safety.

SAME.—*Invitation to Alight.*— Bringing a train to a full stop near the regular station, after having given the usual signal indicating the arrival at the station, is an implied invitation to the passenger to alight.

SAME.—*Contributory Negligence.*—A passenger is not necessarily guilty of contributory negligence, who, without knowledge of the dangerous place at which a train has stopped, and in a dark night, steps from a train which has been brought to a full stop, near the usual stopping place, at the regular time for stopping, and after the customary signal for stopping has been given.

SAME.—*Presumption of Negligence.*—*Burden of Proof.*—Where a railroad train is run past a regular station, and brought to a full stop on a dangerous trestle-work, the presumption is that there was negligence, and the burden is cast upon the carrier of showing that there was not.

From the Montgomery Circuit Court.

*J. G. Williams, B. Harrison, W. H. H. Miller* and *J. B. Elam,* for appellant.

*G. W. Paul, M. D. White* and *J. E. Humphries,* for appellee.

ELLIOTT, J.—On the night of December 9th, 1881, the appellee's intestate, Andrew J. Buck, took passage on one of the appellant's passenger trains at the town of Darlington for the station of Sugar Creek, not far distant. Both these places were regular stations of the company, at which passengers were received and discharged, and the train on which the deceased took passage stopped at Sugar Creek. About the time the train usually arrived at this station, and at the place where the signal whistle for the station was usually sounded, the engineer caused the customary signal to be given, and applied the brakes, but the brakes did not stop the train, and it ran by the station and was stopped on a trestle bridge, three hundred and eighty-five feet beyond the usual stopping place. The deceased stepped from the car in which he was sitting and fell through the bridge, a distance of nineteen feet, and struck upon the rocks which formed the bed of the stream spanned by the trestle-work. The night was dark, and there

were no lights about the place where the train was stopped, and the length of the stop was about that ordinarily made at small passenger stations. The regular station was a safe place to alight, and the deceased lived not far distant, and was acquainted with the station and its surroundings. The station had not been called at the time the deceased left the train, but there was evidence showing that it was not the custom of the railroad company's employees to call the name of the station.

The deceased was found in the creek, and, if not delirious when first reached, very soon became so, and was taken to a house near by. It was not far from eight o'clock when he fell from the trestle-work, and the physician who reached him at half-past ten o'clock thus describes his condition: "I found him lying upon the bed on his left side, his head somewhat elevated, his body in a perspiration, right leg drawn up, left extended; there was a cut on his chin—on the left side—it was about an inch and a half long; his left ankle was swollen, blood clot on either side, and there was a bruise on his back, low down; his eyes were closed, one of the pupils of his eyes was larger than the other, one dilated and the other contracted; he seemed to be suffering pain, groaning and crying, and asking 'Where am I?' 'What has happened?' 'Where is Bess?' that is the name by which he called his wife; his sense of hearing seemed to be not acting, as he would not respond to questions except by a groan." The witness then stated that he took the temperature of his patient's body, and stated the result of his examination in detail. Visits were made on the 10th, 11th and 14th days of December, and the deceased was still suffering from the pain in his head. In answer to a question, the physician said: "He was suffering from what we call a concussion of the brain; it continued until January 14th, 1882, the day of his death." A visit was made on the 16th day of December, and from that time visits were made daily, and oftener until the death of the patient. A graphic description of the progress of the case was read from a book called "The Physician's Case Book,"

and from this testimony it appeared that the pain in the head and the surgical fever found present on the 10th day of De- cember continued until the end, but that typho-malarial fever had supervened, and that the immediate cause of death was hemorrhage from the bowels. The medical witness was asked on cross-examination how the injury contributed to the death of his patient, and he answered: "By receiving a fall on the 9th of December, and in that fall receiving a concussion of the brain. There was a condition of the brain in which his nervous system was affected, and by the sprained ankle which confined him to his bed; and the injury under his jaw and on his back, by confining him to his bed, put his system in a favorable condition to take on disease—whatever the disease prevailing in the community might be, and the result of his being confined to his bed and the surgical fever he had following these injuries. He gradually drifted into malarial troubles, which were then rife in our community. The shock that his nervous system had received, and the depress- ing influence it had upon his system, had rendered it less able to bear the continued fever and typho-malarial fever, and this surgical fever put him in a condition to take on malarial fever, and the result of this malarial fever was hemorrhage of the bowels, from which he died." At an- other place in his testimony, the witness said that the injuries did, in one sense, produce the fever which resulted in death. Dr. Hopper, another physician, testified that he visited the deceased on the 11th day of January, and, in answer to an interrogatory, gave it as his opinion "That the fall contrib- uted to his death—the injuries received from falling off the trestle." It was proved that the malarial fever was epidemic in the vicinity of Sugar Creek station, and that the deceased, prior to the fall from the trestle-work, was in robust health.

The contention of the appellant is that the evidence does not show that the injuries received by Andrew J. Buck, caused his death.

In order to discover a principle which will lead to a just

decision of the question here confronting us, it will be necessary to reason from analogous cases, for we have found no case precisely in point, nor have we found in any text-writer a rule which governs such a case as this. A long settled rule of the common law, adopted and enforced in criminal cases, supplies a close analogy. One of the most philosophical of our law-writers thus states this ancient rule: "Now these propositions conduct us to the doctrine, that, whenever a blow is inflicted under circumstances to render the party inflicting it criminally responsible if death follows, he will be deemed guilty of the homicide though the person beaten would have died from other causes, or would not have died from this one had not others operated with it; provided the blow really contributed either mediately or immediately to the death, in a degree sufficient for the law's notice." 2 Bishop Cr. L., section 637. At another place this author says: "And the wound need not even be a concurrent cause; much less need it be the next proximate one; for, if it is the cause of the cause, no more is required." 2 Bishop Cr. L., section 639. The greatest names among the sages of the law are arrayed in support of this doctrine. 1 Hale P. C. 428; 1 Hawk. P. C. 93. It is sustained by the English, American and Prussian courts. It is the law of this State as declared in at least two cases, one of which was well discussed. *Kelley* v. *State,* 53 Ind. 311; *Harvey* v. *State,* 40 Ind. 516. If it is sufficient to show in cases where life and liberty are involved that the wrong was the "mediate cause," it must surely be sufficient where nothing more than money is involved.

In close agreement with the fundamental principle of which we have just spoken is the doctrine of the court in *Jeffersonville, etc., R. R. Co.* v. *Riley,* 39 Ind. 568, where it was held that the trial court properly refused to instruct the jury, in an action like this, that "the injury complained of can not be regarded as the proximate cause of death, if the deceased had a tendency to insanity and disease, and the injury received by him, producing his death, would not have produced the

death of a well person." Straight in line with our own case is that of *Drake* v. *Kiely*, 93 Pa. St. 492. In that case a lad was taken against his will on a freight train and carried a distance of five miles, he returned home on foot, running most of the way, became ill and the ultimate result was that he became crippled in both legs, and it was held that the defendant was liable for all the injuries received. The court said the true rule is that the proximate cause must be determined by the jury upon all the facts in the case.

If we were to undertake to declare any other rule than that stated in the case cited, we should be involved in inextricable confusion, for it is clear that the passenger who suffers, as the appellee's intestate did, injuries of a serious character is entitled to some damages, and it is impossible for any one to pronounce, as matter of law, at what point the injury flowing from the wrong terminated. The only possible practical rule is that the wrong-doer, whose act is the mediate cause of the injury, shall be held for all the resulting damages, and that the question of whether his wrong was the mediate cause is one for the jury. But there are other cases sustaining the doctrine of this court. In *Ginna* v. *Second Avenue R. R. Co.*, 8 Hun, 494, affirmed on appeal, 67 N. Y. 596, the plaintiff received an injury through the negligence of the railroad company, which resulted in the development of a poisonous discharge causing death, and the company was held liable. It was there said: "More attentive treatment might have saved the life of the young man, but its necessity was not apparently suspected. He was subjected to that which was followed and designed to be proper by the wrongful act of the defendant. That was the cause which placed his life in jeopardy, because it produced the wound whose poisonous discharges resulted in his death." So it may be justly said of this case; it was the wrongful act of the appellant which placed the intestate's life in jeopardy. He who wrongfully places another's life in jeopardy is responsible for the loss of that life; the appellant did place the intestate's life in

jeopardy, and is, therefore, responsible. The case of *Brown* v. *Chicago, etc., R. W. Co.*, 54 Wis. 342, S. C., 41 Am. R. 41, is strongly in point, and contains an exhaustive review of the authorities. In that case a pregnant woman was carelessly directed by a brakeman to leave the train at a point three miles short of her station, and she walked to her destination. This walk brought on miscarriage and illness, and it was held that for these consequences the carrier was responsible. Many cases are cited in support of this ruling. A like decision was rendered in *Houston, etc., R. R. Co.* v. *Fredericka*, by the Supreme Court of Texas, see 41 Am. R. 56, *n*, and in *Fitzpatrick* v. *Great Western R. W. Co.*, 12 U. C. Q. B. 645, a similar ruling was made. In *Brown* v. *Chicago, etc., R. W. Co., supra*, it was said of *Pullman, etc., Co.* v. *Barker*, 4 Col. 344, S. C., 34 Am. R. 89, that it is "unsustained by authority." The decision in *Sauter* v. *New York, etc., R. R. Co.*, 66 N. Y. 50 (23 Am. R. 18), is that the representatives of one injured through the negligence of a railroad company are entitled to recover damages caused by his death, although the immediate cause of death was the mistake of the surgeon who treated him. In *Williams* v. *Vanderbilt*, 28 N. Y. 217, the carrier's negligence caused a passenger to be detained several weeks on the Isthmus of Panama, where he contracted a local fever, which disabled him for a long time after his return to New York, and this resulting injury was held a ground of recovery. A man by a wrongful act frightened a woman and caused her to flee from her house. In her flight she fell from a fence, and a miscarriage and illness resulted, and the defendant was held liable for this consequential injury. *Barbee* v. *Reese*, 60 Miss. 906. In the same line, but not quite so closely analogous, is the case of *Pennsylvania Co.* v. *Hoagland*, 78 Ind. 203 (approved in *Lake Erie, etc., R. W. Co.* v. *Fix*, 88 Ind. 381 (45 Am. R. 464), and *Louisville, etc., R. R. Co.* v. *Kelly*, 92 Ind. 371), where it was held that damages were recoverable for illness caused by exposure to cold re-

sulting from carelessness in directing a passenger to alight at the wrong station.

It will be found on investigation that the decisions we have referred to are really members of an old and long established class of cases going back as far at least as the case so famous in the books as the "Squib Case." They do no more than apply a well known principle to new and peculiar instances. This general doctrine is well stated in *Baltimore, etc., R. R. Co.* v. *Reaney*, 42 Md. 117, where it was said: "The law is a practical science, and courts do not indulge refinements and subtleties, as to causation, that would defeat the claims of natural justice. They rather adopt the practical rule, that the efficient and predominating cause, in producing a given event or effect, though there may be subordinate and dependent causes in operation, must be looked to in determining the rights and liabilities of the parties concerned." At another place in the same opinion it is said: "To entitle such party to exemption, he must show not only that the same loss *might* have happened, but that it *must* have happened, if the act complained of had not been done. *Davis* v. *Garrett*, 6 Bing. 716." In a recent work it is said: "Any wrongful act which exposes one to injury from rain, heat, frost, fire, water, disease, the instinctive or known vicious disposition or habits of animals, or any other natural cause, under circumstances, which rendered it probable that such an injury will occur, is a primary, efficient and proximate cause, if the injury ensue. Many such cases have been referred to in the preceding pages." 1 Sutherland Dam. 62.

In *Byrne* v. *Wilson*, 15 Irish C. L. 332, a stage-coach in which the plaintiff's intestate was a passenger was thrown into a canal by the negligence of the driver, and the lock-keeper turned on the water, thereby causing the death, by drowning, of the passenger, and it was held that the proprietor of the coach was liable under Lord Campbell's act, the court saying: "The precipitation of the omnibus into the lock was

certainly one cause, and (as it may be said) the primary cause of her death, inasmuch as she would not ·have been drowned but for such precipitation. It is true that the subsequent letting of the water into the lock was the other and more proximate cause of her death, and that she would not have lost her life but for such subsequent act, which was not the· *necessary* consequence of the previous precipitation, by the negligence of defendant's servants. But, in my opinion, defendant is not relieved from liability for his primary neglect, by showing that but for such subsequent act the death would not have ensued." The Chief Justice, in his opinion, said: " The law is clear that every party is liable, not only for the· immediate consequences of his negligence, but also for the resulting consequences of his acts, whether those acts are acts of violence, or of negligence in breach of a duty which imposed the necessity of care and caution upon him." Proceeding upon the general rule we have stated, the court, in Eaton v. *Boston, etc., R. R. Co.,* 11 Allen, 500, said: "And it is no answer to an action by a passenger against a carrier, that the negligence or trespass of a third party contributed to the injury." ' A like ruling was made in *Spooner* v. *Brooklyn City R. R. Co.,* 54 N. Y. 230.

The case of *Hatchell* v. *Kimbrough,* 4 Jones L. (N. C.) 163, supplies an instructive illustration of the rule. There a roof was removed from a house and the eye of the plaintiff was lost in consequence of the exposure resulting, and the defendant was held liable. The general rule is recognized and enforced by our own cases. *Billman* v. *Indianapolis, etc., R. R. Co.,* 76 Ind. 166, S. C., 40 Am. R. 230; *City of Crawfordsville* v. *Smith,* 79 Ind. 308 (41 Am. R. 61); *Binford* v. *Johnston,* 82 Ind. 426, S. C., 42 Am. R. 508; *Dunlap* v. *Wagner,* 85 Ind. 529 (44 Am. R. 42); *Louisville, etc., R. W. Co.* v. *Krinning,* 87 Ind. 351.

We turn now to the cases cited by the appellee. We have already shown by the quotation made from the able opinion in *Brown* v. *Milwaukee, etc., R. R. Co., supra,* that the case

of *Pullman, etc., Co.* v. *Barker*, 4 Col. 344, is not sustained by authority, and we now add that it can not be supported on principle. The cases of *Krach* v. *Heilman*, 53 Ind. 517, and *Collier* v. *Early*, 54 Ind. 559, were shown in *Dunlap* v. *Wagner*, 85 Ind. 529, to be in conflict with the cases of *Schlosser* v. *State, ex rel.*, 55 Ind. 82, *Fountain* v. *Draper*, 49 Ind. 441, *Barnaby* v. *Wood*, 50 Ind. 405, and *English* v. *Beard*, 51 Ind. 489, and to be condemned by other courts as well as by text-writers. It remains to add that the cases of *Ryan* v. *New York, etc., R. R. Co.*, 35 N. Y. 210, and *Fairbanks* v. *Kerr*, 70 Pa. St. 86 (10 Am. R. 664), on which the cases of *Krach* v. *Heilman, supra*, and *Collier* v. *Early, supra*, are mainly founded, are in direct conflict with the decision in *Louisville, etc., R. W. Co.* v. *Krinning*, 87 Ind. 351. Not only is this true, but it is also true, as shown by Judge Cooley, that the cases of *Ryan* v. *New York, etc., R. R. Co., supra*, and *Fairbanks* v. *Kerr, supra*, are everywhere repudiated. Cooley Torts, 76 n. The courts of New York have not followed *Ryan* v. *New York, etc., R. R. Co., supra*, as very clearly appears from the decisions in *Webb* v. *Rome, etc., R. R. Co.*, 49 N. Y. 420 (10 Am. R. 389); *Pollett* v. *Long*, 56 N. Y. 200; *Wasmer* v. *Delaware, etc., R. R. Co.*, 80 N. Y. 212 (36 Am. R. 608). We need not stop to inquire whether the case of *Scheffer* v. *Railroad*, 105 U. S. 249, is sustained by authority or not, for it is readily discriminated from the present case; there the court held that the representatives of one who became insane from an injury received in a collision, and eight months afterward took his own life, could not recover. The court said: "The proximate cause of the death of Scheffer was his own act of self destruction. * * The argument is not sound which seeks to trace this immediate cause of the death through the previous stages of mental aberration, physical suffering, and eight months' disease and medical treatment to the original accident on the railroad." There is a plain difference between the case cited and the one at bar. In the former the immediate cause of death was an independent agency, and between the original

injury and the death many other causes had intervened and a long time had elapsed; while in this case the death occurred soon after the injury, and the effects of the injury were unbroken and continuous from the time it was received until death ensued. In the case cited the violent act of the man himself produced the death; while in the one in hand a disease superinduced by the injury caused the death, and there was no break in the line of causation.

A carrier of passengers is held to the exercise of a very high degree of care, and for a failure to use this care is responsible to a passenger who suffers an injury in a case where no fault of his contributes. It was said by this court in *Jeffersonville, etc., R. R. Co. v. Hendricks*, 26 Ind. 228, in speaking of the duty of railroad companies: "But they are required to exercise the highest degree of care to secure the safety of passengers, and are responsible for the slightest neglect, if an injury is caused thereby." There are many cases in our own reports to the same effect. *Gillenwater v. Madison, etc., R. R. Co.*, 5 Ind. 339; *Thayer v. St. Louis, etc., R. R. Co.*, 22 Ind. 26; *Sherlock v. Alling*, 44 Ind. 184; *Louisville, etc., R. R. Co. v. Kelly, supra.* The rule is stated in stronger terms by the courts elsewhere as well as by the text-writers. Hutchinson Carriers, sections 500, 501, n; Thompson Carriers, 200, 204.

It is the duty of railroad carriers of passengers to stop at the regular stations and at safe places for alighting. Thompson says: "It is the duty of servants of the railway company to run their trains so that a passenger shall have a reasonably safe and convenient place for alighting." Thompson Carriers, 228. This is substantially declared in *Jeffersonville, etc., R. R. Co. v. Parmalee*, 51 Ind. 42. In *Memphis, etc., R. R. Co. v. Whitfield*, 44 Miss. 466 (7 Am. R. 699), the court said in a case very like the present: "Stopping the train at an unusual place, rendered the company presumptively in the wrong to that extent, and the *onus* of explaining this neglect was thrown upon the defendants." Shearman & Redf. Neg., sections 12, 280; *Curtiss v. Rochester, etc., R. R. Co.*, 29 Barb.

282; Angell Carriers, section 569; 2 Redf. R. W., section 176. It is said by Hutchinson: "The passenger is entitled not only to be properly carried, but he must be carried to the end of the journey for which he has contracted to be carried, and must be put down at the usual place of stopping." Hutchinson Carriers, section 612. In *Praeger* v. *Bristol, etc., R. W. Co.*, 24 L. T. (N. S.) 105, the train ran by the platform and the passenger was injured in leaving the car. The carrier insisted that there was no evidence of negligence, but COCKBURN, C. J., said: "The question is whether there was a want of reasonable care on the part of the company, and I think there was not only evidence, but abundant evidence, of this." The case of *Cockle* v. *South-Eastern R. W. Co.*, 27 L. T. (N. S.) 320, is very similar to the one just cited, and a like ruling was made. In the case last named it was said: "But it appears to us that the bringing up of a train to a final standstill, for the purpose of the passengers alighting, amounts to an invitation to alight, at all events, after such a time has elapsed that the passenger may reasonably infer that it is intended he should get out if he proposes to alight at the particular station." It is held in the case cited, and in many others, that where the stop is made at a dangerous place near the usual station, and about the usual time for stopping, the carrier should warn the passengers not to leave the train, or should apprise them of the dangerous place. *McLean* v. *Burbank*, 11 Minn. 277, *vide* opinion, p. 288; *Maury* v. *Talmadge*, 2 McLean, 157; *Laing* v. *Colder*, 8 Pa. St. 479; *Stokes* v. *Saltonstall*, 13 Peters, 192; *Montgomery, etc., R. R. Co.* v. *Boring*, 51 Ga. 582. The case of *Pennsylvania R. R. Co.* v. *White*, 88 Pa. St. 327, is very like the present, and the plaintiff was held entitled to recover. The court said: "It is the duty of the company to provide for the safe receiving and discharging of passengers. It is bound to exercise the strictest vigilance not only in carrying them to their destination, but also in setting them down safely, if human care and foresight can do so: *Railroad Co.* v. *Aspell*, 11

Harris, 147." Applying the law as declared by the authorities cited, and many more might be added, it is clear that there was a breach of duty in running by the station and stopping at a dangerous place.

A rule adopted by this court and sanctioned by many authorities of the highest character here requires attention. That rule is thus stated by Judge Redfield: "The fact that injury was suffered by any one while upon the company's trains as a passenger, is regarded as *prima facie* evidence of their liability." Redf. Car., section 341. Professor Greenleaf's statement of the rule is substantially the same. 2 Greenl. Ev., section 227. Judge Cooley gives the question careful consideration, and makes a like statement of the rule. Cooley Torts, pp. 660, 663.

In the early English case of *Christie* v. *Griggs*, 2 Campb. 79, it was said: "The plaintiff had made a *prima facie* case by proving his going on the coach, the accident, and the damage he has suffered." This rule has long been recognized by our cases as the correct one. In speaking of the effect of evidence of the fact that an injury was received by the passenger, it was said, in *Jeffersonville, etc., R. R. Co.* v. *Hendricks, supra:* "Ordinarily such fact should be regarded, at least, as *prima facie* evidence of negligence on the part of the company," and this statement of the rule is adopted in the subsequent cases of *Sherlock* v. *Alling, supra* ; *Pittsburgh, etc., R. R. Co.* v. *Williams,* 74 Ind. 462 ; *Cleveland, etc., R. W. Co.* v. *Newell,* 75 Ind. 542 ; *Memphis, etc., Co.* v. *McCool,* 83 Ind. 392, S. C., 43 Am. R. 71. In the case last named many authorities are cited, to which may be added *Railroad Co.* v. *Walrath,* 38 Ohio St. 461, S. C., 43 Am. R. 433 ; *Philadelphia, etc., R. R. Co.* v. *Anderson,* 94 Pa. St. 351, S. C., 39 Am. R. 787 ; *Indianapolis, etc., R. R. Co.* v. *Horst,* 93 U. S. 291 ; *Roberts* v. *Johnson,* 58 N. Y. 613 ; *Pittsburgh, etc., R. R. Co.* v. *Pillow,* 76 Pa. St. 510, S. C., 18 Am. R. 424.

The rule is a general one, and is stated in general terms, and it is not to be understood that it goes to the extent of

supporting a claim to a recovery where the evidence shows there was no negligence on the part of the carrier, or rebuts the presumption of negligence. It must, therefore, be true in most instances that the negligence, or freedom from negligence, will appear from the evidence, because, in proving the occurrence from which the injury resulted, the nature and cause of the accident will necessarily appear. Of course, if the evidence rebuts the presumption of negligence, there can not be said to be a *prima facie* case, although there may be an accident and an injury.

In some of the cases the view is taken that if a thing occurs which ought not to have occurred, had the requisite degree of care been exercised, then the carrier must show that such care was exercised. In one case it was said: " But where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen, if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from the want of care." *Scott* v. *London, etc., Co.*, 3 H. & C. (Exchequer) 596. Of the case cited, a judge, perplexed by the confusion consequent upon the departure from the ancient rule, said: " I now gladly turn to one case, distinguished from the chaos of authorities depending on particular facts, by an attempt at the application of something in the nature of principle to cases of this class." *Flannery* v. *Waterford, etc., R. W. Co.*, 11 Irish C. L. 30. In the case at bar there was no evidence explaining the failure to stop at the regular station, nor was there any explanation of the failure to give warning; neither was there any explanation of the cause of stopping on the dangerous trestle bridge.

We think the evidence fully sustains the finding that there was negligence on the part of the appellant.

The remaining question is whether the intestate was guilty of such contributory negligence as bars a recovery. The question of contributory negligence is generally one for the

jury, and courts interfere with the verdict only in clear cases. *City of Indianapolis* v. *Gaston*, 58 Ind. 224 ; *Pennsylvania Co.* v. *Hensil*, 70 Ind. 569 (36 Am. R. 188) ; *Louisville, etc., R. W. Co.* v. *Richardson*, 66 Ind. 43 (32 Am. R. 94) ; *City of Washington* v. *Small*, 86 Ind. 462, see page 469 ; *Pennsylvania R. R. Co.* v. *White*, 88 Pa. St. 327 ; *Willard* v. *Pinard*, 44 Vt. 34.

The court can not declare as matter of law that a passenger is guilty of contributory negligence, who alights from a train, on a dark night, after the customary signal has been given for stopping at his known destination, and the train has fully stopped near the usual alighting place and near the time when it was there due. We have already quoted from cases holding that a passenger who alights when a train is brought to a full stop, near the usual alighting place, is not guilty of contributory negligence in attempting to leave the train, unless it appears that the danger was apparent, and we now direct attention to other cases bearing upon the same subject. In *Robson* v. *North Eastern R. W. Co.*, L. R., 10 Q. B. 271, the train overshot the platform but the station was not called, and the passenger attempted to alight and was injured. It was held that a nonsuit was improperly directed. It was said " that there was evidence from which a jury might have properly found that the plaintiff was invited or had reasonable ground for supposing she was invited to alight by the company's servants." The language of the court in *Curtis* v. *Detroit, etc., R. R. Co.*, 27 Wis. 158, clearly states a general principle applicable to this case : " If, under the circumstances of this case, the train, in being brought up to the station, came to a stop in such a manner as to induce the belief on the part of the passengers in waiting on the platform that it had stopped for the reception of passengers, and then, when the passengers, acting on this belief, were going aboard, started again without caution or signal given, that would constitute an act of negligence on the part of the company, and be so without regard to the question whether the starting was one of necessity, or whether the stop was an actual or only

an apparent one. It was the duty of the company, if the passengers were not to enter the cars under such circumstances, to have some one there to warn and prevent them." In our own case of *Evansville, etc., R. R. Co.* v. *Duncan*, 28 Ind. 441, a complaint, after alleging that the plaintiff took passage for Fort Branch and like matters, stated that by the carelessness of the defendant the train stopped at the town of Fort Branch before that part of the train on which the plaintiff was seated had reached the depot, and that by reason thereof the plaintiff was compelled to jump from the car to the ground, and the complaint was held sufficient, the court saying: "As to the second objection, it is sufficient to say that we do not understand from the averments that the rash conduct of the plaintiff produced the injury." In *Columbus, etc., R. W. Co.* v. *Farrell*, 31 Ind. 408, the general doctrine we have laid down is recognized and enforced.

In *Jeffersonville, etc., R. R. Co.* v. *Hendricks*, 41 Ind. 48, the court said: "Was not the attempt of the decedent to leave the cars, under the facts stated, 'made under such circumstances that a person of ordinary caution and care would not have apprehended danger therefrom?' If it was, then the decedent was without fault or negligence; and in our opinion, the decedent was not guilty of negligence in attempting to leave the train under the circumstances." The question stated in this quotation is that which arises in all cases of a kindred character, and is one, as a general rule, to be left to the jury. The principle that a man is not guilty of contributory negligence who acts upon a reasonable belief arising from surrounding circumstances, is one of wide application, finding perhaps one of its most striking applications in that class of cases where a passenger leaves a train in order, as he believes, to escape impending danger. *Stokes* v. *Saltonstall, supra; Twomley* v. *Central Park, etc., R. R. Co.*, 69 N. Y. 158, S. C., 25 Am. R. 162, 164 n.; *Wilson* v. *North Pacific R. R. Co.*, 26 Minn. 278, S. C., 37 Am. R. 410; *Iron R. R. Co.* v. *Mowery*, 36 Ohio St. 418, S. C., 38 Am. R. 597. In all such cases the passenger

is excused, even though his belief was an erroneous one, and but for his leaping from the train no injury would have resulted. Without going further into this subject, although many more authorities might be cited, we conclude by a quotation from a recent English author who, after a thorough review of the adjudged cases, says : " But the question of what circumstances amount to an invitation to alight is clearly one for a jury ; and although there seems to have been difficulty felt in time past by some of our judges in reference to this point of law, it seems impossible that any further doubt should exist." Wood's Browne Carriers, 507.

The principles we have stated rule the case and dispose of all the questions presented, whatever form they may assume.

Judgment affirmed.

Filed March 5, 1884.

## On Petition for a Rehearing.

Elliott, J.—We have given the elaborate brief filed on the petition for a rehearing careful study, but find nothing in it that shakes our confidence in the conclusions stated in our former opinion.

Counsel assume that the fever of which the plaintiff's intestate died was an independent cause, entirely separate from the injury received by the fall from the trestle-work. The evidence does not warrant this assumption, for it shows that the injury concurred in producing the fever, and also in producing the enfeebled condition which incapacitated the injured man from resisting the inroads of disease. There was not only a condition created which made it probable that the intestate would take on the disease, but there was also such an enfeeblement of the system as impaired its power to repel disease.

Counsel argue the case as though it were necessary that the evidence should show with direct and positive certainty that the injury produced death. The assumption upon which the argument rests can not be made good. It is not necessary in any civil case to prove the substance of the issue by direct or

positive evidence. It is sufficient if there are facts fairly warranting the jury in inferring the conclusion insisted upon by the plaintiff. *Indianapolis, etc., R. R. Co.* v. *Collingwood*, 71 Ind. 476; *Indianapolis, etc., R. W. Co.* v. *Thomas*, 84 Ind. 194; 1 Greenl. Ev., section 13, n. In the case before us, the evidence very clearly and fully warranted the inference that the injury concurred in producing death; indeed, any other conclusion would be directly opposed to that which the evidence supports.

It was not necessary that the appellee should show that the injury was the sole or direct cause of the death. The conclusion stated in our former opinion is fully sustained by a case which has been brought to our attention since that opinion was written. The case to which we refer is that of *Beauchamp* v. *Saginaw, etc., Co.*, 50 Mich. 163, S. C., 45 Am. R. 30. In the course of the opinion the court said: "Is it clear beyond dispute, that the cold taken, pneumonia and death were independent and separate from the injury received and sickness resulting therefrom? Can it be said with judicial certainty that the injury, the sickness and weakness following therefrom did not directly cause or largely contribute to the attack of pneumonia, and that the party wrongfully injured was as able to withstand this resultant attack as he would have been if 'a good, healthy, well nourished boy' as at the time he received the injury? If the injury received and sickness following concurred in and contributed to the attack of pneumonia, the defendant must be held responsible therefor. It can not be said that here was a second wrongful act, or a disease, wholly independent of the first wrong, which caused the death of the boy. *People* v. *Cook*, 39 Mich. 239." The case in hand is in every feature infinitely stronger than the one from which we have quoted.

In commenting upon the case of *Baltimore, etc., R. R. Co.* v. *Reaney*, 42 Md. 117, cited in the former opinion, counsel criticise it with much severity, but their judgment is opposed by very weighty authority. The case is fully approved in

*Beauchamp* v. *Saginaw, etc., Co., supra,* and in the following text-books is cited with approval: Cooley Torts, 79; 2 Thompson Neg. 1084; 3 Sutherland Dam. 418. It is sustained by the English cases which are cited in the opinion of the court, and we are content to join them rather than follow counsel.

Cases are cited by counsel as to evidence of negligence in cases where the relation of carrier and passenger does not exist, and all that need be said of them is that they have no application at all to a case like this, where the relation of carrier and passenger existed.

The general rule upon the subject of proof of negligence in a case like this, stated in our former opinion, is that laid down in *Jeffersonville, etc., R. R. Co.* v. *Hendricks, supra,* where it was held that proof of the happening of an accident to a passenger is *prima facie* evidence of negligence on the part of the carrier, and that rule has been enforced by many cases, as we have heretofore shown. We did not hold in our former opinion that the rule applied to a case where there was nothing more than a simple failure to stop at a regular station; we had no such case before us; but we did hold that the general rule applied to a case where the evidence showed that the train was stopped on a dangerous trestle-work after there had been an implied invitation to alight, and where no warning was given to the passenger to remain on the train. We have no doubt that such evidence makes a *prima facie* case which will prevail unless overcome by evidence from the carrier. The case of *Delaware, etc., R. R. Co.* v. *Naphes,* 90 Pa. St. 135, sustains our view and lends counsel no support. In that case it was said that the general rule was a reasonable one, "because the company has in its possession and under its control, almost exclusively, the means of knowing what occasioned the injury and of explaining how it occurred, while as a general rule, the passenger is destitute of all knowledge that would enable him to present the facts, and fasten negligence on the company, in case it really existed." Any other rule would practically absolve railway carriers from lia-

The Terre Haute and Indianapolis R. R. Co. *v.* Buck, Administratrix.

bility in a great majority of cases, for the passenger would seldom be able to ascertain the real cause of the accident. The case before us supplies an apt illustration of the unreasonableness of the rule for which the railroad company contends. How could Mr. Buck, made delirious by his fall from the trestle-work, have ascertained what caused the train to run by the station and stop a short distance beyond upon a dangerous trestle-work?

There was no evidence satisfactorily explaining the stopping of the train upon this trestle-work, and the failure to warn of danger the passenger that the conductor knew expected to alight at the station. Nor was there evidence explaining why the train ran by. There was evidence showing that the brakes slipped, but no evidence at all showing that they were in order, were properly constructed, or even that they were properly applied. They may have been air brakes, and yet neither properly constructed, nor in good order, nor timely applied. The conductor, knowing that his passenger desired to alight, and knowing, as the evidence tended strongly to show, that the name of the little station was not usually cried, ought to have seen that the passenger was in some way notified of the dangerous stopping place. There were other facts tending to show negligence, as, for instance, that the men engaged in running the train were taken from other trains, and, taking all the evidence together, it was abundantly sufficient to warrant the jury in inferring negligence.

We do not deem it necessary to again go over the authorities cited on the subject of contributory negligence; they fully sustain our conclusion. The question in *Cincinnati, etc., R. R. Co.* v. *Peters,* 80 Ind. 168, was one of pleading; here it is one of evidence. All that was decided in that case is stated in the opinion of WORDEN, J. The argument of Commissioner FRANKLIN was not approved. The case of *Jeffersonville, etc., R. R. Co.* v. *Hendricks,* 41 Ind. 48, fully sustains the conclusion reached by us. We quote: " Was not the attempt of the decedent to leave the cars, under the facts stated, 'made

under such circumstances that a person of ordinary caution and care would not have apprehended danger therefrom?' If it was, then the decedent was without fault or negligence; and in our opinion, the decedent was not guilty of negligence in attempting to leave the train under the circumstances. The train having very nearly come to a full stop, the decedent had the right to suppose that it would stop long enough for her to leave the train; and she had also the right to suppose that some of the agents of the company would be present to aid and assist her in leaving the cars, and if her just expectations had been realized, she could and would have safely left the train." So, in this case, if the railroad company had done its duty, or had conformed to its usual practice, the deceased's reasonable expectations would have been realized, and he could have left the train in safety. The text-writer referred to by counsel gives their argument no support, for he says, as we have said, that the question of contributory negligence is "in every instance of the kind one of fact for the jury." Hutchinson Carriers, section 615. It is also said by this author: "Such companies must be extremely careful not to mislead their passengers into the belief that the halting of a train at a station is meant as an invitation to them to alight where it is not so intended, and that if the conduct of the servants engaged in its management is such as may reasonably produce that impression, and the passenger so understands it, and in the attempt to leave the coach at a place where there are no facilities provided for his doing so, and whilst in the exercise of due diligence he is injured, the company will be liable."

In the case in hand we need not inquire what effect uncontradicted evidence that it has been the uniform custom to call the station before permitting passengers to alight would have had, for there was evidence tending to show that there was no such custom, and that the station was very seldom called.

Petition overruled.

Filed June 25, 1884.