WOODMEN OF THE WORLD v. HIPP.

(Court of Civil Appeals of Texas. Austin. April 3, 1912. Rehearing Denied May 8, 1912.)

1. INSURANCE (§ 819*)—ACTION ON POLICY—SUFFICIENCY OF EVIDENCE—DEATH IN VIOLATION OF LAW.

Evidence, in an action on a benefit certificate, defended on the ground of insured's. breach of a stipulation avoiding the certificate, if insured should die in consequence of a viola-

tion of law, *held* sufficient to show that insured was killed while making an assault in violation of a penal statute.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 2006, 2007; Dec. Dig. § 819.*]

2. INSURANCE (§ 787*)—DEATH IN VIOLATION OF LAW.

Where insured was shot and killed in consequence of his violation of law, in breach of a provision in the benefit certificate, it was immaterial that the person shooting him also committed an offense.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1955, 1957–1959; Dec. Dig. § 787.*]

3. INSURANCE (§ 787*)—ACTION ON POLICY—DEATH IN VIOLATION OF LAW—SELF-DEFENSE.

In an action on a benefit certificate, defended on the ground that insured had died in consequence of his violation of law, thereby avoiding the certificate, there was evidence that insured went to the house of another, and that such person, while in an angry mood at words spoken by insured, approached insured without any weapon or words indicating an intention to assault insured, and that insured then struck him a violent blow upon the head with a chair, immediately following which he was shot. *Held*, that such circumstances did not justify insured in striking in self-defense, so as to exempt him from a violation of law and a breach of the certificate.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1955, 1957–1959; Dec. Dig. § 787.*]

4. APPEAL AND ERROR (§ 1177*)—DISPOSITION—REVERSAL.

After a judgment for plaintiff, in an action on a benefit certificate, defended on the ground that the insured's death was in consequence of his violation of law, where one person present at the time the insured was killed did not testify at the trial, the court cannot say that the record indicates that the case could not be made stronger for the plaintiff; and hence will reverse and remand for a new trial, instead of reversing and rendering judgment for defendant.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4597–4620; Dec. Dig. § 1177.*]

Appeal from District Court, Tom Green County; J. W. Timmins, Judge.

Action by Mrs. Jennie Hipp against the Woodmen of the World. Judgment for plaintiff, and defendant appeals. Reversed and remanded for new trial, with directions to instruct a verdict for defendant on testimony the same as that upon the former trial.

This is a suit upon a policy of insurance. Appellant defended upon the ground of a breach of a stipulation in the contract of insurance, which prescribed that, "if the member holding this certificate * * * should die in consequence of the violation or attempted violation of the laws of the state or of the United States, or any other province or nation, this certificate shall be null and void and of no effect, and all moneys which shall have been paid, and all rights and benefits which have accrued on account of this certificate, shall be absolutely forfeited, without notice or service." There

was a jury trial, which resulted in a verdict and judgment for plaintiff, and the defendant has appealed, and vigorously assails the verdict and complains of the action of the trial court in not giving a peremptory instruction, directing the jury to return a verdict for the defendant. The certificate of insurance contains the stipulation set out above. The testimony, showing how the assured came to his death, was as follows:

"J. A. Staley, a witness for the defendant, testified as follows: 'My name is J. A. Staley. I live on the Concho river, in Tom Green county, about five or six miles from the town of Miles. My family consists of myself, one little boy, and two little girls. My boy, Charles Adrian, is 12 years old. One of my girls is 8 and the other 6. I knew Hue Hipp, and he came to my house about the 3d of September, 1910. He was at my house when he died. At the time he came to my house, I was there with Charles and the two little girls. He and Mr. Duncan came between 8 and 9 o'clock at night. About 8 or 9 o'clock, Mr. Hipp and Mr. Duncan knocked on my door, and above said he wanted about 30 matches. I asked who it was, and he said Hue Hipp. I opened the door and got him the matches. He asked me to take a drink, and I told him that I had quit drinking, and they persuaded me to take one drink with them. They then started home, and Mr. Hipp lost his hat. Mr. Duncan offered me the drink of whisky. I loaned Hipp a hat. They started home again, and it commenced raining. They then turned back, and asked me if they could stay until the rain was over, and I said, "Yes," and also asked them to stay all night. They came back in the house, and after a while Mr. Hipp wanted to go home, but Mr. Duncan objected; so Hipp and I went outdoors and took out the mules. After we came back into the house, Hipp commenced to talk, and used very bad language. Talked about my wife. He said that if he had been with her he could have satisfied her, and she wouldn't have to run off. My wife had run off and left me. My little boy was present at the time, and the two little girls were in bed. He was talking about my wife's cousin, and said she had offered things to him when she was running the restaurant. I told him that he must not talk that way; that he was in the presence of my children. We then went in the kitchen, and I don't remember anything more that occurred. I don't remember when he struck me. I did not come to after being struck until next morning about 5 or 6 o'clock. When I came to, I found a wound upon my head. Had a doctor to come and see me at once. The skin was cut, and it took five or six stitches to close the wound. I was cut to the skull. I didn't know anything about being hurt until next morning.'

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

"Cross-examination: 'I do not know what hurt me, except from hearsay. I don't remember taking any whisky, except the drink at the buggy and the toddy in the house. I don't remember anything after we went in the kitchen and dining room. I don't remember jumping on Mr. Hipp or getting mad at him, and didn't know who hit me. I do remember the conversation about my wife having run off and left me; and that took place before we went into the kitchen. I don't know whether it was brought up in the kitchen or not. Such talk hurt my feelings, because it was in the presence of my little girls. I don't know how long prior to the time I was struck before I lost my memory. I don't remember getting up from the table in the kitchen, or do not remember walking into the other room, with Mr. Duncan following and holding me.'

"Adrian Staley testified for the defendant as follows: 'My name is Adrian Staley. I am 12 years old. My father is J. A. Staley. I have two sisters. We lived last year on Mr. Hick's place, south of Miles. I was at home when Mr. Hipp and Mr. Duncan came to our house one night. My sisters were there too. No one else was there, except my father. We had all gone to bed when they came. I saw Mr. Hipp in our bedroom. I got up when they came in the room and put on my clothes. I heard Mr. Hipp say to my father that he would love to be with Mamma; that she wouldn't have left him. I heard him say something about Mamma's cousin. After such talk, my father, Mr. Hipp, and Mr. Duncan went into the kitchen, where they took a toddy, and Papa told Hipp not to come into the bedroom; and after a while Papa and Mr. Duncan came into the bedroom and stopped at the door. Mr. Duncan put his arms around Papa, and then turned him loose, and Papa went in there, and Mr. Hipp struck Papa, and I got my gun and shot him. Papa had nothing in his hand at the time. He had on overalls—bibb overalls, fastened around his waist. Mr. Duncan came with Father into the bedroom. Mr. Hipp said he had been wanting to get on Papa. Papa went in the kitchen, and Mr. Hipp struck him. I saw Mr. Hipp strike Papa with a square chair, which had rounds going down from the top with the side posts coming up above the top of the chair. Mr. Hipp took hold of the side posts above the top of the chair. After he hit Papa, he held the chair by the top of the side posts. I shot him with a 22 target, and at the time I shot him he was stooping over a little and looking towards me. He was in the bedroom, and my father was between me and him, lying on the floor. I saw the wound on my papa's head. It was away in about two inches, and I poured water on it. I shot Mr. Hipp because he knocked Papa down, and I thought he was dead. I don't know where I shot him; but

it was somewhere about the breast. He was in the kitchen when I shot him.'

"Cross-examination: 'I just had one load. I don't know all that was said, and don't know all that was done in the kitchen. When Father got up to go out of the kitchen into the bedroom, he looked like he was mad. Mr. Duncan caught around him, and I don't know whether he was holding him or not. When he turned him loose, he turned and walked back where Mr. Hipp was, and if he hadn't stopped I guess he would have gone to him. He looked like he was mad. Mr. Hipp was setting down when Papa and Mr. Duncan was scuffling. When Mr. Hipp saw Papa come towards him, he got up, picked up a chair, and when Father got close enough he struck him. I don't know what Father was doing or going to do to Mr. Hipp. Just before he struck him, I don't know what he went into the bedroom for. Mr. Duncan grabbed him about the time he went into the bedroom, and he turned around facing the door. I don't know how long Mr. Duncan held him; but it was not long. Father walked back towards Mr. Hipp just like he always does. He did not try to strike him. I don't know whether they were going to fight when he got back in there or not. He looked mad. I didn't know whether there was going to be trouble or not. My sisters were in bed. I don't know whether they were asleep or not.'

"Redirect examination: 'Mr. Hipp never turned the chair loose after he picked it up until I shot him. He stood behind the kitchen chair.'

"Recross: 'The chair was setting down, and he was holding to the rounds, leaning over on the chair. He had the chair by the posts, which were on each side of the back and above the slat on the back. After Papa was struck, I went and got the gun, loaded it, and shot Hipp. At the time, he was holding to the chair.'"

Blanks, Collins & Jackson, of San Angelo, for appellant. Anderson & Dumas and Bell & Upton, all of San Angelo, for appellee.

KEY, C. J. (after stating the facts as above). [1, 2] We sustain appellant's contention, and hold that the evidence clearly shows that the assured died in consequence of a violation on his part of a penal statute of this state. The testimony above set out is all that was placed before the jury concerning the manner of Hipp's death; and we think it shows, beyond a reasonable doubt, that he was killed by young Staley, because of the fact that Hipp had, immediately before the killing, made an unlawful and inexcusable assault upon his father. It is not necessary to consider in this case whether or not the stipulation in the policy, providing for a forfeiture for a violation of the laws of this state, would apply to a breach of the civil statute, because in this case it is clear that

the law which the deceased violated was a criminal law written in the Penal Code of this state. Nor is it necessary to consider whether the offense committed by the deceased was an assault with intent to murder, an aggravated assault, or a simple assault. It seems clear that it was at least an aggravated assault; but, if not, then it is certain that it was a simple assault, and a violation of the Penal Code. Furthermore, it is immaterial in this case whether or not the lad who killed Hipp committed an offense, or was excusable in so doing.

[3] From the testimony that was submitted, we fail to find anything that presented the question of self-defense on the part of the deceased. It is true the boy testified that when his father and Mr. Duncan came out of the kitchen into the bedroom Mr. Duncan had his arms around Mr. Staley, as if attempting to hold him; it is also true, after Mr. Duncan turned Mr. Staley loose, the boy says his father went back towards Mr. Hipp, and looked like he was mad at that time. But he says that his father had nothing in his hands at that time. He does not state that anything was said or done by his father indicating an intention to assault or otherwise injure Mr. Hipp; yet as soon as his father approached near enough the latter struck him a violent blow upon the head with a chair. Mr. Hipp had so demeaned himself as to justify Mr. Staley in being angry; and the mere fact that while in that condition he approached Mr. Hipp, without doing or saying anything indicating an intention to injure him, did not justify Mr. Hipp in striking him as he did. Mr. Staley was in his own house, and he had the right to go wherever he pleased; and he did not forfeit any right by the mere fact that while in an angry mood he approached the deceased; and that fact and those circumstances afforded no reasonable ground for Mr. Hipp to suppose that Mr. Staley was about to make an attack upon him. While we regard this as a stronger case in favor of appellant, we think the following authorities support the ruling here made: Bloom v. Franklin Life Ins. Co., 97 Ind. 478, 49 Am. Rep. 469; Terre Haute R. R. Co. v. Buck, 96 Ind. 346, 49 Am. Rep. 168; Cincinnati, etc., E. Co. v. Faton, 94 Ind. 474, 48 Am. Rep. 179; Dunlap v. Wagner, 85 Ind. 529, 44 Am. Rep. 42; Gresham v. Equitable L. & A. Ins. Co., 87 Ga. 497, 13 S. E. 752, 13 L. R. A. 839, 27 Am. St. Rep. 263; Wolf v. Connecticut Mut. L. Ins. Co., 5 Mo. App. 236.

[4] Appellant asks that the case be reversed and rendered; but, as one person was present at the time the deceased lost his life who did not testify at the trial, we are unable to say that the record indicates that the case cannot be made any stronger for the plaintiff. Unless Mr. Duncan was as drunk as the record indicates that Mr. Staley was, it may be that he can give testimony tending to show that the deceased was acting in self-

defense when he struck Mr. Staley, and therefore was not violating the law; and, if such was the fact, then there was no breach of the contract of insurance, and the defense relied on would not avail.

So we have reached the conclusion that the judgment of the trial court should be reversed, and the case remanded for another trial, with directions to instruct a verdict for the defendant, if the testimony should be the same as it was upon the former trial.

Reversed and remanded.

JENKINS, J., did not sit in this case.