ELLET v. THE ST. LOUIS, KANSAS CITY & NORTHERN RAILWAY COMPANY, *Appellant.*

1. **Pleading**: SPECIAL PLEA: GENERAL DENIAL. In an action against a railroad company for the death of a passenger, the negligence alleged was the want of care in the servants of the company and defects in its road. The defendant denied all the allegations of the petition, and also filed a special plea alleging that the road was well constructed, the servants skillful and careful, but that the casualty was caused by an extraordinary rain storm. *Held,* that this matter could be shown under the general denial, and the special plea was properly stricken out.

2. **Railroads**: STATUTE REQUIRING DITCHES: EXTRAORDINARY STORMS. The statute requiring railroad companies to construct ditches and drains along the sides of their road-beds does not require them to provide against floods which are extraordinary and unprecedented.

3. **Pleading**: SPECIFIC ALLEGATIONS: NEGLIGENCE. A petition charg-

ing negligence in a railroad company in conducting and running its train, where the negligence complained of is that of the engineer in managing it at the time of the casualty, is sufficiently specific.

4. A Petition, Objectionable for not being sufficiently specific, may be good after verdict.

5. Railroads: DEFECT IN TRACK CAUSED BY EXTRAORDINARY STORM: NEGLIGENCE. The overturning of a railroad train was caused by the sudden weakening of the track by an extraordinary flood. There was no defect in any car in the train, or in the track, or in the ditches or drains at the side of the road-bed. In an action for the death of a passenger caused thereby, Held, that the liability of the company depended upon the question whether or not the engineer of the train, on approaching the place where the track had been so weakened by the flood, had reason to believe from the height of the water in the ditches, etc., that it had previously risen so as to soften the road-bed and render the track unsafe. If he had, it was his duty to have tested the track before taking his train over it, and this omission would amount to negligence for which the company would be liable.

*Appeal from Buchanan Circuit Court.*—HON. JOS. P. GRUBB, Judge.

REVERSED.

*Wells H. Blodgett* for appellant.

1. The court erred in striking out the new matter contained in the answer. The practice act, (1 R. S., p. 603,) requires the answer to contain, 1st, A general or special denial of the material allegations of the petition, and 2nd, A statement of any new matter. To apprise the plaintiff of its reliance upon an extraordinary storm, it was necessary for defendant to state that fact in an appropriate manner in its answer. *Northrop v. Mo. Val. Co.*, 47 Mo. 435. In this State any new or affirmative matter relied upon, such as the contributory negligence of a plaintiff, should be affirmatively pleaded and proven. *Thompson v. N. Mo. R'y Co.*, 51 Mo. 190; *Harrison v. Mo. Pac. R'y Co.*, 74 Mo. 364; *Buesching v. St. Louis Gas Co.*, 73 Mo. 219;

*Milwaukee, etc., R. R. Co. v. Hunter*, 11 Wis. 167; *Iron Mountain Bank v. Murdock*, 62 Mo. 73. *

2. There was no duty on the defendant to provide drains sufficient for an extraordinary storm. " It might with equal propriety be required that they should have provided against a flood, such as the deluge in the days of Noah." *Nashville & C. R. R. Co. v. David*, 6 Heisk. 261; Shear. & Red. on Neg., (3 Ed.) § 445; *Pittsburg & C. R. R. Co. v. Gilleland*, 56 Pa. St. 445; *Livezey v. Phil.*, 64 Pa. St. 106; *s. c.*, 3 Am. Rep. 578.

3. The eighth instruction was erroneous. It requires the defendant to exercise the same care to prevent injuries from acts of God and *vis major* as it is required to exercise as to agencies and forces subject to its control. Such is not the law. *R. R. Co. v. David*, 6 Heisk. 261; *s. c.*, 19 Am. Rep. 594; *R. R. Co. v. Reeves*, 10 Wall. 176; *Trans. Co. v. Downer*, 11 Wall. 129; *R. R. Co. v. Gilleland*, 56 Pa. St. 445; *Withers v. R. R. Co.*, 3 H. & N. 969; *Nugent v. Smith*, L. T. (N. S.) 827; *Ward v. A. & P. Tel. Co.*, 71 N. Y. 81; *s. c.*, 27 Am. Rep. 10; *Flori v. St. Louis*, 69 Mo. 341; *Sawyer v. R. R. Co.*, 37 Mo. 241.

*Strong & Mosman* for respondent.

1. Everything in the special plea was provable under the general denial. Bliss Code Pleading, § 329; *Greenway v. James*, 34 Mo. 326; *Corby v. Weddle*, 57 Mo. 452.

2. The defendant being a carrier of passengers is bound to exercise the utmost care and diligence, and is responsible for the slightest neglect. Strong on Bailments, § 601; *Lemon v. Chanslor*, 68 Mo. 356; *Sales v. Western Stage Co.*, 4 Clarke (Iowa) 547; *Hegeman v. Western R. R. Co.*, 13 N. Y. 9; *Frink v. Potter*, 17 Ill. 406.

3. The carrier is liable for a loss arising from inevitable necessity existing at the time of the loss, if his previous misconduct or negligence occasioned the exposure to such necessity. *Armentrout v. R'y Co.*, 1 Mo. App. 158;

*Vail v. Pacific Co.*, 63 Mo. 230; *Pruitt v. R. R. Co.*, 62 Mo. 542; *Clark v. R'y Co.*, 39 Mo. 184; *Hardy v. Carolina Cent. R. R. Co.*, 74 N. C. 734.

HOUGH, C. J.—This is an action brought by the widow of Richard S. Ellet, deceased, to recover from the defendant the statutory penalty of $5,000, on account of the death of her husband, which was occasioned by the overturning of a train of cars on the defendant's railway, near the town of Salisbury, in Chariton county, on the night of September 5th, 1876, on which train the deceased was a passenger.

The material portion of the petition is as follows:

"That, while said Richard Ellet was being carried by defendant as such passenger, in said coach, on said 5th day of September, 1876, at a point on said railroad at or near the town of Salisbury, in Chariton county, Missouri, the defendant, not regarding its duty to said Richard Ellet as such passenger, and its duty to plaintiff, did, by its servants and agents, so carelessly, negligently and unskillfully conduct and run its said coach and train of cars, of which said coach was a part, over and along its said railroad, that on that day, at the point aforesaid, on said railroad, by the carelessness, negligence and default of said defendant, its servants and agents, and for want of due care, caution and attention to its duty to said Richard Ellet as such passenger, the said coach, in which he was then carried by defendant's said railroad, overturned, and by reason of a defect and insufficiency in defendant's said railroad at the point aforesaid, as well as by the negligence, carelessness and lack of caution of defendant's servants in charge of said train, was violently thrown down the side of an earth embankment (which was then and there a part of said railroad track), and into deep water, which was there at the time accumulated against said road and upon the lands adjacent to said earth embankment and upon said road, by reason of the negligence and carelessness of defendant in this, to-wit: That the defendant did not, at the point

aforesaid, construct, and had not maintained there, at and before the time aforesaid, suitable and sufficient ditches or drains along each side of said road-bed, connected with other drains or water-courses, so as to afford sufficient outlet to drain and carry off the water obstructed and then accumulated there by the construction of said road-bed of defendant and by said embankment, and said Ellet was violently carried and thrown with and in said coach down the declivity of said earth embankment, and into said deep water, and thereby greatly bruised, wounded and disabled, and by and in said water strangled."

The petition further charged that the sleeping car in which the deceased was being carried, was defectively constructed, but as the court instructed the jury that there was no evidence that said car was defectively or improperly constructed, it is unnecessary to notice this allegation further.

The defendant denied all the allegations of the petition, and for a further defense, alleged: That, long prior to September 5th, 1876, defendant's railroad-bed, tracks and embankments, at the place of the accident, had been built of the best materials for the construction of railroads, in a careful and prudent manner, with ample and sufficient drains and water-ways, and that the same was maintained and kept up in such condition by defendant on said day. Defendant avers and charges that said railroad and embankment, at the place where said train was overturned, had withstood for a long series of years the hardest storms that had prevailed in that locality, and that said railroad embankment, at said place, could only have been weakened by some convulsion of nature, or other extraordinary cause. Defendant charges that, on the night of the accident, and but a short time before the arrival of said train, there had been a sudden and extraordinary rain storm at and near the place where the cars were overturned, of wholly unprecedented violence, and that, in consequence thereof, the waters had

1. PLEADING: special plea: general denial.

suddenly risen to an extraordinary height, and had suddenly and secretly undermined and weakened a portion of the road-bed and embankment at said place. Defendant avers that, on or about midnight of said September 5th, 1876, when said train attempted to pass over this portion of the road-bed, there was no water on the track, and the same seemed to be safe and sound; but that, in consequence of the embankment having been, before the arrival of said train, secretly and suddenly undermined and weakened, as aforesaid, a portion of the dirt under some of the ties on the north side of the road-bed gave way, and a part of said train was overturned, and said Ellet was then and there killed. Defendant avers that, at the time and place when and where the cars were overturned, the speed of the train was only five or six miles an hour, when the regular card time of said train along said portion of the road was twenty-five miles an hour. Defendant also avers that the servants in charge of the train itself were competent and skillful, and were at the time, and all along had been, in the discharge of their respective duties; that the train itself was properly equipped with the best appliances and materials, and that all the servants whose duty it was to look after said track and train were at the time, and had at all times been, engaged in the proper performance of their duties. Defendant avers that none of its servants knew, or could reasonably have known, that the embankment had been undermined or weakened or endangered prior to the accident; that the overturning of said cars, and the death of said Ellet, was in nothing caused by any omission of duty or negligence of defendant's servants, but that said cars were overturned, and said Ellet killed, in sole and direct consequence of the sudden and unknown weakening of said embankment by the extraordinary rain and storm aforesaid.

This defense was, on motion of the plaintiff, stricken out, but the defendant was permitted to cross-examine the plaintiff's witnesses as to all the matters therein set up,

.and to introduce evidence on its own behalf to establish ·said defense. We see no error in this action of the court. The matters set up in the special defense could all be proven under the general denial.

The court instructed the jury that there was no evidence tending to show that the defendant's road-bed or track was defectively or improperly constructed, at the time when and place where the injury occurred, or that the engine and cars composing the train were defective or insufficient in any particulars which contributed to the death of said Ellet, so that it will be unnecessary to refer with particularity to the testimony bearing upon these points.

It appears from the record that about one mile west of Salisbury, where the cars were overturned, the defend-.ant's road passes through a high rolling prairie; that there was a pond on the south side of the road, made by the .construction of an embankment across a ravine or "prairie hollow," which embankment was eight feet high above the ordinary level of the water in the pond. The pond in an ordinary stage of water would cover between one and two .acres of land, and was of an average depth of from four to six feet. The embankment was about sixty feet wide at it base, fifty-six feet wide on a level with the water in the pond, and twelve feet wide at the top, and was rip-rapped on the south side to within three feet of the top of the ties. The pond was provided with a large overflow or .discharge ditch about three hundred yards long, running west on the south side of the road-bed, and parallel to it. The ditch was about twenty-five feet wide at the top, five feet deep, and varied in width at the bottom from six to ten feet. The ditch was not so constructed as to completely drain the pond, but when the water would rise above its ordinary level it flowed through the ditch. Some pickets were placed in the bottom of this ditch for the purpose of preventing hogs from passing through it, but it does not .appear that they injuriously affected the capacity of the

ditch. The undisputed testimony shows that this ditch, as constructed, was amply sufficient for the .drainage of the overflowing waters of the pond in all ordinary times and seasons, and that after the heaviest rains known in that locality, during the eight or ten years which had elapsed since the building of the embankment, the ditch was never known to be overflowed ánd the water never rose in the pond higher than from two and a half to three feet of the top of the road-bed, and during the whole of said time the embankment had never been damaged or endangered by any previous storm.

About ten o'clock on the night of the accident a storm of extraordinary and unprecedented violence prevailed between Salisbury and Keytesville, a station on defendant's road seven miles west of Salisbury, and over the water shed drained by the pond and ditch before described.

Some of the witnesses who lived at Salisbury and Keytesville and in the vicinity of the pond testified that they never saw one equal to it in violence. One witness who had resided in Chariton county for thirty years, described it as the heaviest and most extraordinary storm that he ever knew. A physician who had resided at Salisbury for nine years and who was at the time of the storm two and a half miles southeast of the place of the disaster, testified that the rain was the hardest he had ever seen; that he was on horseback on a level prairie and his horse was knee-deep in water in the space of ten minutes; that spouts of water fell as thick as his arm. Subsequent examination disclosed the fact that while this flood of water was being poured upon the earth in the vicinity of the pond, the water suddenly accumulated in the pond in such quantity that it overflowed the embankment and softened and loosened the earth under the ties and undermined the same on the north side to such an extent that it gave way while the train in question was passing over it. About the time at which this extraordinary storm was prevailing the train on which the deceased was a passenger reached.

Brunswick, a station sixteen miles west of the embankment and pond. The train dispatcher at Kansas City who was controlling the movement of this train being informed by the operator at Brunswick that a storm was prevailing there, directed the operator to hold the train until he could hear from Salisbury. The train dispatcher then inquired of the operator at Salisbury as to the storm, and whether a freight train bound east had arrived, and directed him to get a report from the conductor of that train. The operator at Salisbury replied that they were having a very hard storm there, that the freight train had just arrived from the west, and its conductor reported a very hard storm between there and Brunswick, but that the track was all right. The train dispatcher then told the operator at Brunswick to let the train go, informing him at the same time that the freight train had arrived at Salisbury, and that the conductor had reported the track all right. While this train was at Brunswick, the conductor received a telegram from Thomas McKissock, the general superintendent of defendant's road, who was then at Moberly, a station about twenty miles east of Salisbury, saying, " Run carefully and look out for high water—show this to engineer."

Mr. McKissock, in explanation of this dispatch, testified as follows: " I told conductor to tell engineer to come on cautiously by the streams, and look out for high water. Before the accident I had no knowledge or information that any damage had been done to the track. There had been a violent thunder-shower about Moberly from tea time till about nine or ten o'clock at night, coming and receding again. I inquired at Kansas City if they had any rain there; he said no. I inquired by telegraph, through the operator. I am not an operator. I inquired of Lexington Junction; he said, 'No storm.' I inquired at Brunswick; he said it rained moderately there. I inquired of Macon, north of Moberly; he said it had been raining considerable there. He said that it had been raining north —that showers were north. It was about nine o'clock

when I sent instructions to the conductor to tell the engineer to look out for high water and come on carefully. I sent that because I thought the storm was north of us, in the neighborhood of Macon, and the trains were coming directly toward Moberly from the west, and the waters on the west side of the divide, toward Macon, all ran into the Chariton and streams there, and I did not know but that they might be swollen. The water from there runs toward our road into the Missouri river, and our road crosses the streams. Between Brunswick and Salisbury the streams enter into the Missouri river, and I sent the dispatch on account of the information I had received in regard to the storm at Macon and northwest. The clouds seemed to be in that direction. I had no information of storms on the line of the road. My replies all were that there were no heavy rains. It is not unusual for me to make these inquiries on the road. I frequently do it. This dispatch was not sent because I had any information that any damage had been done to the track by the storm of that night."

There is no testimony tending to show that the officers or servants in charge of the train, or any officer of the defendant in charge of, or having a right to control the movements of this train, knew before it left Brunswick, which was the last station where it could be reached by telegraph, of the extraordinary violence of the storm, and of the quantity of water which had fallen, or of the flooding of the embankment by the waters of the pond.

The management of the train after it left Brunswick is thus detailed by the engineer who was driving the engine: " Left Brunswick at half-past ten or eleven o'clock. When I left Brunswick I knew there was no water till we got to Farmers' Creek, and I slackened up there and then went on. Before I got to Keytesville I slackened up for Chariton river, and after that I ran slow—from six to ten miles an hour. I knew every trestle, and as I approached them I would slacken my speed until I saw they were all right. I saw no water running under the trestles until I passed

section-house, a mile and a half west of where accident occurred. I encountered no rain-storm with my train. The first rain I saw was when we passed DeWitt, six miles west of Brunswick. Between DeWitt and Brunswick it rained quite a hard shower four or five minutes. I took water at tank west of Brunswick, and it was not raining. At Brunswick we had to take coal, and when we were there it rained quite severely for five or not over ten minutes. I saw no evidences of high water until I got in the vicinity of where the accident occurred. I saw none, except in the little holes, that I could see by the lightning, until I got within a mile of the place of the accident, and there I saw some running under a trestle. I ran slow. I was not expecting trouble. I suppose I was running ten or fifteen miles an hour until I got to the Salisbury grade, and here is a trestle. I slacked up there, and went over it very slow. As I went up the grade, I saw the ditch was running nearly full of water, probably eight, ten or twelve inches below the ties. I ran slow, because I was afraid the water might have cut the bank out beside the ditch. I ran six or eight miles an hour, but when I passed the east end of ditch I increased my speed. It was about three car-lengths further where we went over. When we went over we were running about eight miles an hour. I was running six miles an hour, and gave engine more steam, because I was on heavy grade. The nearest I saw water to ties was eight inches; that was where the water entered the ditch. It was probably ten or twelve inches from the top of the water to the ties. The ties are, I think, about eight inches thick, and that would make it a foot and a half from the top of the ties. The earth covers the ties between the rails, and the top of the earth and the top of the rails are about on the same line. The first information I had that the train was in danger, was when I felt it stop suddenly and pull back. The first I knew, the engine stopped and settled back, probably three feet. I was not aware of any accident, or danger of accident, until I felt engine stop.

The engine, baggage car and express car went over the place of the accident in safety. The bank gave way near rear end of train; baggage car was careened over so trucks on one side were off the rail. When I approached the point, I could see nothing wrong with the ties. They were all in place, and the rails were all in line. I could see it very distinctly from the head-light. If water ran over track before accident, it left no evidence of it. At the time I went over it there was no water going over the track."

On cross-examination he said he had never seen the water within three or three and a half feet of where it was that night. When the earth gave way under the track, on the north side of the embankment, the ties and rails under the rear of the train slid from the top to the side of the embankment, and all of the coaches in the train, six in number, gradually turned over on the north side of the track, and lay coupled together where they fell. The engine and tender, the baggage car and express car passed over in safety and remained on the track. Ellet, the deceased, was in the upper berth, on the north side of one of the sleeping coaches, and when the car turned over this berth closed of itself by reason of its weight, and the motion given it by the overturning of the coach, and fastened with a spring bolt, and could only be opened from the outside. When the berth was opened by a relative of the deceased, some fifteen minutes after the accident, Ellet was found to be dead.

A number of railroad experts testified on a hypothetical case based upon the testimony as to the dimensions and construction of the embankment, the size and character of the pond, the capacity of the overflow ditch, and the height of the water in the pond when the train reached it, and the appearance of the road-bed and track to the engineer, that it was not an imprudent exercise of judgment or discretion in the engineer to attempt to go over it, if he did not know that the water had been higher, or

34—76

that it had not remained where it was long enough to soften the embankment. There was some conflict in the testimony as to the knowledge and conduct of the section foreman, having in charge that portion of defendant's road where the accident occurred, but under the pleadings we think it unimportant.

The following instructions were given at the instance of the plaintiff:·

1. It is admitted that defendant is a corporation; that it was, at the time stated in the petition, a common carrier of passengers for hire; that plaintiff is the widow of Richard Ellet, named in the petition; that said Ellet was a passenger for hire on defendant's train, when he was killed at the time and by the means charged in the petition.

2. If the jury find for the plaintiff, they will assess her damages at the sum of $5,000.

4. Though the jury believe from the evidence that defendant's train mentioned in the evidence was thrown from the track by reason of a defect in the roadway caused by an extraordinary storm and rain-fall; yet, if they believe from the evidence that defendant's servants, in control of, or operating or directing the movements of said train, knew or were informed before they attempted to pass said train over the track of said storm, that said storm had passed that way, or had such information or special orders from their superior officers as would cause a prudent man to apprehend injury by said storm to the said roadway, such as to render travel over the same more hazardous than was ordinarily incident to such travel over that portion of defendant's road, and that defendant's servants could have ascertained, by exercising reasonable prudence and diligence, the existence and character of such defect before the attempt to pass over said defective point, and did not exercise such prudence and diligence before attempting to pass over said defective or dangerous portion of defendant's road with the train mentioned, and that said

Ellet's death was occasioned by such defect, they will find for plaintiff.

5. The court instructs the jury that it was the duty of defendant to cause to be constructed and maintained open and unobstructed suitable ditches and drains along the sides of said road-bed of its railway, to connect with other water-ways so as to afford sufficient outlets to drain and carry off the water along such railway whenever and wherever the natural draining of such water has been obstructed by the construction of such roadway; and if the jury find that the defect in defendant's roadway at the point mentioned in the evidence was the result of the neglect or failure of defendant to construct or keep open and free from obstruction such sufficient ditch from the basin mentioned, and that such drainage was made necessary by the construction of said roadway, and that said defect in said road caused the death of said Ellet, then the jury will find for the plaintiff.

7. The court instructs the jury that if the defendant, its officers, servants and employes had reason to anticipate danger from a violent rain-storm, then it was their duty to actively and energetically use all the means at their command, or that might fairly be expected of and would suggest themselves to careful, skillful, prudent railroad men under like circumstances, to ascertain and protect its passengers from danger or injury from said cause; and if they find that the defendant, its agents, officers or employes did anticipate danger from said storm, and, by actively and energetically using such means as would have been suggested to careful, skillful, prudent railroad men in like circumstances, could have ascertained the defect in its roadway produced by said storm, and thus have avoided the accident which resulted in the death of said Ellet, and failed to do so, then the jury will find for plaintiff.

8. The court instructs the jury that it is the duty of the defendant to keep its road and works and all portions of the track in repair, and so watched and tended as to

secure, so far as vigilant human foresight can do, the safety of its passengers; and if the jury find from the evidence that, by the exercise of vigilant human foresight in the watching and tending said track, the overturning of the train in proof and the death of said Ellet might have been avoided, then they will find for the plaintiff.

11.   The court instructs the jury that, for the purpose of this inquiry, the Pullman Palace car, in which said Ellet was riding, was a part of defendant's train and under its control, and the conductor and porter thereof were the servants of the defendant.

For the defendant the following instructions were given:

1.   The court instructs the jury that there is no evidence in this case tending to show that defendant's road-bed or track were defectively or improperly constructed, on the night of the disaster, at the place where said train was overturned.

2.   The court instructs the jury that there is no evidence in this case tending to show that any part of the car in which Richard Ellet was riding, at the time of his death, was defectively or improperly constructed.

4.   The jury are instructed that there is no evidence in this case that the engine and cars composing the railway train were defective or insufficient in any particular which contributed to the injury complained of.

5.   The court instructs the jury that the defendant, as a common carrier of passengers over its railroad in its cars, did not undertake to insure or absolutely guarantee the safety of Richard Ellet, and the defendant was not bound to have its road-bed, or track, or cars absolutely safe, nor did the law require the defendant to adopt every possible precaution to prevent Richard Ellet from being injured, and the persons in charge of defendant's railroad and train were only required to use that degree of care which prudent railroad men would exercise under like cir-

cumstances, with no knowledge that an accident was about to happen.

10. If the jury believe from the evidence that, at the time said train was overturned, the servants of the defendant were exercising, and had exercised, the highest practicable diligence which capable and faithful railroad men would exercise under similar circumstances, and that the road and track were undermined and weakened during said night, and but an hour or two before the arrival of said train, by a sudden and unprecedented rain-storm, and that said train was in direct consequence thereof overturned and the plaintiff's husband thereby killed, then the plaintiff cannot recover in this action, and the finding must be for the defendant.

13. Although the jury may believe from the evidence that the defendant's road-bed was so constructed as to form a pond of water on the south side of its track at the place where the train was overturned; yet, if the jury believe from the evidence that the ditch or water-way on the south side of defendant's track was sufficient in size to carry off the water that fell and flowed toward the track at the place where the accident occurred during the greatest storms which had previously been known to occur in that locality, without damaging the embankment, and that said ditch or water-way was maintained in that condition at the time of the disaster, then the jury cannot find the defendant guilty of negligence in the construction or maintenance of the ditches or water-ways along its track where said cars were overturned.

The instructions asked by the defendant and refused by the court, have not been referred to in the brief of the appellant, and it is, therefore, unnecessary to notice them.

It is quite apparent from the foregoing statement of facts, that the death of Ellet resulted from a sudden and unknown weakening of the track of the defendant by an extraordinary and unprecedented rain-storm. There was no negligent defect in the car in which the deceased was

being conveyed, nor in any other portion of the train. There was no defect in the construction of the embankment or roadway. The existence of the pond was not a matter of which a passenger could complain, unless it occasioned him injury, and if the existence of the pond at its usual level did not impair or in any way endanger the security of the embankment, as the undisputed testimony shows, and if the ditch constructed along the roadway was sufficient to carry off all the surplus or overflow water which experience had shown could be collected in the pond in the hardest storms ever known in that locality, so far as the security of the roadway was concerned, the defendant had done all that could be required of it. Indeed it would appear from the testimony of one of the plaintiff's witnesses who was a railroad expert, that the pond was a protection to the embankment in that it prevented the surface water when suddenly accumulating in the basin made by the embankment, from dashing against the embankment, and wearing it away, before it turned to run off in the ditch.

Whether the statute requiring railway companies to construct ditches and drains along the sides of their road-beds, be regarded as intended for the protection of the track of the railway, or for the protection of the lands of the adjacent proprietor, or both, it certainly cannot be interpreted to mean that a railway company shall anticipate and make provision for floods which are extraordinary and unprecedented in the locality where such ditches and drains are required to be constructed. The fifth instruction given for the plaintiff follows the language of the statute without any explanation whatever of its meaning, and would naturally be construed by the jury to require the defendant to construct ditches sufficient to carry off all the surface water which might at any time and under any circumstances be collected on the sides of the road-bed; and the jury were, therefore, in effect told, that if the defendant failed to con-

2. RAILROADS: statute requiring ditches: extraordinary storms.

Ellet v. The St. Louis, Kansas City & Northern Railway Company.

struct a ditch sufficient to carry off all the water which accumulated in the pond on the night in question, and the track was thereby injured and the death of Ellet resulted therefrom, the defendant is liable. This instruction not only does not correctly declare the law, but it is also in conflict with the thirteenth instruction given for the defendant, which does correctly declare the law. *Flori v. The City of St. Louis*, 69 Mo. 341.

On the testimony adduced at the trial the jury could very appropriately have been told by the court that there was no testimony tending to show that the death of Ellet was occasioned by any negligent defect in the construction of the ditch.

The eighth instruction given for the plaintiff announces a correct principle of law, but is inapplicable to the issues raised by the pleadings.

The principal question in the case, and indeed the only one upon which the case could, under the testimony properly have gone to the jury, is whether the engineer in charge of the train was guilty of negligence in attempting, under the circumstances disclosed by the evidence, to go over the embankment at the time and in the manner he did.

It should be stated in this connection that complaint was made in argument that the allegation of negligence

3. PLEADING: special allegations: negligence.

on the part of the servants of the defendant in charge of the train, was vague and insufficient. The petition clearly charges negligence in conducting and running the train, and this allegation is certainly sufficient to cover the conduct of the engineer in the management of the train at the time of the accident. *Edens v. H. & St. Jo. R. R. Co.*, 72 Mo. 212.

But even if the petition should have been more specific in this particular, no objection was taken by the de-

4. JEOFAILS.

fendant before trial, and it is certainly good after verdict. *Chouteau v. Gibson, ante*, p. 38.

Although the engineer had no notice of the extraordinary violence of the storm before reaching the pond,

5. RAILROADS: de-
fect in track
caused by extra-
ordinary storms:
negligence
yet, when he arrived there, and as he states, found the water at the western end of the ditch within eight inches of the ties, and in the pond within ten or twelve inches of the ties, and from three to three and a half feet higher than he had ever seen it before, these facts were of themselves notice to him that there had been an unusual and extraordinary storm in that vicinity, and in the absence of information on the part of the engineer as to how long the water had been at that height, or as to whether it had been higher, it was his duty to exercise the utmost circumspection before attempting to go over the embankment, and the utmost care and skill in the management of his train in going over it. If the engineer had reason to believe that the water had been higher than it was when he reached the pond, or that it had remained at the height at which he saw it, long enough to soften the earth upon which the ties rested, which, according to the testimony of the experts, would have been an hour or an hour and a half, then although the ties were in place and the rails were in line, it would have been his duty to have inspected or tested the track before venturing over it with his train. On the other hand, if the engineer had no reason to believe that the water had been higher than he saw it, or that it had remained where it was long enough to soften the earth under the ties, and he saw the ties in place and the rails in line, then, according to the testimony of all the experts, he was not guilty of negligence in attempting to take the train over the embankment. This is a question of fact for the jury.

For the reasons heretofore given the judgment will be reversed and the cause remanded for a new trial. The other judges concur.