Filed Sept. 21, 1886.

---

## No. 12,793.

### THE LOUISVILLE, NEW ALBANY AND CHICAGO RAILWAY COMPANY *v.* THOMPSON, ADMINISTRATOR.

NEGLIGENCE.—*Complaint.*—A complaint to recover damages for the death of a person must show that the death resulted from the negligent acts charged.

SAME.—*Widow.*—*Competency as Witness.*—A widow is a competent witness for the plaintiff in an action by the administrator of her husband against a railroad company to recover damages for negligently causing his death. Sections 498 and 499, R. S. 1881, do not apply to such actions.

SAME.—*Railroad.*—*Fraudulent Use of Pass Issued to Another.*—*Liability of Carrier.*—One who fraudulently attempts to ride on a non-transferable pass issued to another person, is not a passenger to whom the carrier owes a duty to carry safely, and he can not maintain an action for injuries caused by the carrier's negligence.

SAME.—*Finding Pass on Person of Deceased Traveller.*—*Presumption.*—*Burden of Proof.*—Where a non-transferable pass issued to another person is

The Louisville, New Albany and Chicago R'y Co. *v.* Thompson, Adm'r.

found in the pocket of one who is killed by the negligence of a railroad company, but there is no other evidence that the deceased had procured the pass fraudulently, or was attempting to travel on it, the burden is on the defendant, in an action for damages, to overcome the presumption that the deceased was a *bona fide* passenger.

SAME.—*Conflict of Presumptions.*—Where the facts of a case are consistent with both honesty and dishonesty, the courts will adopt the construction which is in favor of honesty and good faith.

SAME.—*Presumption that One is a Lawful Passenger.*—*Conductor's Check.*—Where one is carried upon a passenger train for many hours, and the conductor of the train has given him a check, which is found upon his person after he has been killed by the carrier's negligence, it will be presumed, in the absence of countervailing evidence, that he was lawfully upon the train as a passenger.

SAME.—*Defective Bridge.*—*Burden of Proof.*—Where a passenger, rightfully on a train, is injured by the breaking down of a bridge, the presumption is that the carrier was guilty of negligence, and the *onus* is upon it to prove the contrary.

SAME.—*Bridge Weakened by Flood.*—*Extent of Carrier's Liability.*—Where a bridge is weakened by a sudden and unprecedented flood, and there is no time or opportunity for inspecting it, the railroad company is not responsible for an injury resulting from its giving way beneath a train run with proper care and skill. *Aliter,* if its unsafe condition may reasonably be discovered in time to avoid danger.

SAME.—*Sufficient to Prove Substance of Issue.*—In actions against carriers to recover for injuries resulting from negligence, it is sufficient to prove the substance of the issue.

EVIDENCE.—*Preponderance.*—*Reasonable Probability of Truth.*—*Duty of Jury.*—It is the duty of the jury, in a civil case, to decide in favor of the party on whose side the weight of evidence preponderates, and according to the reasonable probability of truth.

PRACTICE.—*Exclusion of Evidence.*—*Question as to, How Presented.*—To present a question upon the exclusion of evidence, the particular evidence excluded must be specified with reasonable certainty in the motion for a new trial.

SAME.—*Harmless Error.*—It is only a material error which will authorize the reversal of a judgment.

INTERROGATORIES TO JURY.—*Answer When there is no Evidence.*—If there is no evidence upon a point covered by a special interrogatory propounded to the jury, they may so answer.

SAME.—*Motion to Make Specific.*—*Venire de Novo.*—The truth or falsity of answers to interrogatories is not presented by a motion to compel the jury to make them more specific, nor by a motion for a *venire de novo.*

The Louisville, New Albany and Chicago R'y Co. v. Thompson, Adm'r.

PLEADING.—*Scope and Tenor.*—The character of a pleading must be determined from its general scope and tenor.

From the Washington Circuit Court.

*D. M. Alspaugh* and *J. C. Lawler*, for appellant.

*S. B. Voyles, H. Morris* and *J. A. Zaring*, for appellee.

ELLIOTT, J.—The complaint of the appellee seeks a recovery for the death of Andrew Eichler, which is alleged to have been caused by the negligence of the appellant. It is charged that the appellee's intestate was a passenger on one of the appellant's trains; that because of the negligence of the appellant in constructing and maintaining the bridge across Blue river, the train went down into the river and Andrew Eichler was killed.

We agree with appellant's counsel that it must appear from the complaint that the death resulted from the negligent acts charged, for we understand it to be settled law that it must be shown that the negligence was the proximate cause of the injury. *Pennsylvania Co.* v. *Hensil*, 70 Ind. 569 (36 Am. R. 188); *City of Greencastle* v. *Martin*, 74 Ind. 449 (39 Am. R. 93); *Pennsylvania Co.* v. *Gallentine*, 77 Ind. 322; *Cincinnati, etc., R. W. Co.* v. *Hiltzhauer*, 99 Ind. 486, see p. 488; *Pittsburgh, etc., R. W. Co.* v. *Conn*, 104 Ind. 64.

While we agree with counsel as to the general rule of law, we can not concur with them as to the construction of the complaint, for, in our opinion, the complaint, although somewhat obscure, does charge that appellant's negligence was the proximate cause of the death of Andrew Eichler.

The widow of the intestate was permitted to testify, but, as all that is material in her testimony relates to matters subsequent to her husband's death, or else to matters which were open to the knowledge of all persons who knew the parties, no error was committed even if it were conceded that she was not competent to testify generally as to matters that occurred prior to his death. *Lamb* v. *Lamb*, 105 Ind. 456; *Floyd* v. *Miller*, 61 Ind. 224, 235.

The Louisville, New Albany and Chicago R'y Co. *v.* Thompson, Adm'r.

In the pocket of the appellee's intestate was found a pass reading thus :

"LOUISVILLE, NEW ALBANY AND CHICAGO RAILWAY

"Trip Pass No. 911.

"LOUISVILLE, KY., Dec. 22, 1883.

"Pass J. M. WHALING from Louisville to Chicago. Why issued—acc't C., M. & St. P. R'y. Good in one direction only, unless accompanied by a coupon. Good for one trip only until Feb'y 22d, 1884,

"When countersigned by

"D. F. JENNINGS, *Gen'l Freight Agt.*

"E. B. STAHLMAN, *Second Vice Pres.*

"Accepted subject to conditions on back hereof."

(Indorsed on back.)

"Not good on freight trains—not transferable. The person accepting and using this pass thereby assumes all risk of accident and damage to person or property. If presented by any other than the individual named hereon, the conductor will take up the pass and collect full fare.

"LOUISVILLE, NEW ALBANY AND CHICAGO RAILWAY
COMPANY.

"Dec. 22, 1883.    Chicago."

There was also found in his pocket a conductor's check and about twenty dollars in money. These things were found by the coroner after Eichler's body was recovered from the river into which it had been carried by the fall of the bridge. No explanation was given by either party as to the manner in which Eichler came into possession of the pass, nor as to the circumstances under which it was issued, nor as to who J. M. Whaling was, or where he lived. The conductor of the train on which Eichler took passage, after stating that the train left Chicago for Louisville on the evening of the 23d of December, testified : "I went through it taking up tickets, coupons and passes, and collecting fares. This pass was handed to me by a man on the train that night at Chicago.

I took a portion of the pass—the top part of it—and gave the pass back to the man who handed it to me. I do not know what became of the coupon; I turned it over to the auditor of the company. I did not know either Eichler or Whaling. If I had known it to be Eichler instead of Whaling I would have taken up the pass and collected his fare. The man who gave me this pass paid me no money and gave me no ticket for his fare."

We accept as good law the doctrine of the decided cases,. that one who fraudulently attempts to ride on a non-transferable pass issued to another person, is not a passenger to whom the carrier owes a duty to carry safely. A person who enters a train on a pass to which he has no right, can not, therefore, maintain an action for injuries caused by the carrier's negligence. *Chicago, etc., R. R. Co.* v. *Michie,* 83 Ill. 427; *Toledo, etc., R. W. Co.* v. *Brooks,* 81 Ill. 245; *Toledo, etc., R. W. Co.* v. *Beggs,* 85 Ill. 80 (28 Am. R. 613); *Brown* v. *Missouri, etc., R. W. Co.,* 64 Mo. 536. This rule is founded on sound principle, since it is a fundamental doctrine of the law, that one who is guilty of a fraud can not enforce any rights arising out of his own wrong. It is also in close agreement with the rule that a carrier owes no duty to an intruder. *Nave* v. *Flack,* 90 Ind. 205 (46 Am. R. 205).

The difficult question is, whether the evidence can be justly said to prove that Eichler was attempting to fraudulently use the pass issued to Whaling. There is, as we have intimated, no evidence that he procured the pass fraudulently, or was attempting to travel on it, except such as is supplied by the fact that after his death the pass was found in his pocket. For anything that appears he may have been the mere custodian of it for Whaling. The presumption always is in favor of honesty and fair dealing, and he who asserts the contrary must prove it. A presumption, like a *prima facie* case, remains available to the party in whose favor it arises until overcome by countervailing evidence. *Bates* v. *Pricket,* 5

Ind. 22; *Adams* v. *Slate*, 87 Ind. 573, see p. 575; *Cleveland,* *etc.*, *R. R. Co.* v. *Newell*, 104 Ind. 264. The presumption in favor of Eichler's good faith and honesty was not overcome; it can not, indeed, be justly said that there was any evidence impugning it, for the conductor's testimony does not show that Eichler did not pay his full fare, nor does it show that he was fraudulently in possession of the pass issued to Whaling. There are many ways in which he may have honestly and fairly obtained possession of the pass; it may have been entrusted to him by Whaling, or he may have found it. We can not consent to characterize an act as fraudulent from the single fact that on a dead man's body is found a pass issued to another person. If there were attendant circumstances making it probable that the pass had been wrongfully used, the case would be different, but here there are no such facts, for the conductor says that he did not know the man who presented the pass. It seems much more reasonable that the appellant who issued the pass should explain why and to whom it was issued, and secure the testimony of the man to whom it was given, or else show what had become of him, than to presume from the fact that it was found in a dead man's pocket, that it had been dishonestly obtained or fraudulently used. The appellant had the coupon in its possession, and if it was true that it had been dishonestly used, it could have produced it and given some evidence at least to prove that fact.

It is said by counsel that, "After the wreck, the conductor accounted for all the passengers by the tickets, passes and coupons taken up; that his report showed eight persons to be missing, among them the man supposed to be J. M. Whaling." The testimony of the conductor is that "eight persons were missing, among them was the man I supposed to be J. M. Whaling." We have carefully searched the record to ascertain, if possible, how many bodies were recovered, but we can find no evidence showing that more than two were recovered. We find evidence proving that Blue river was

very high; that the body of Eichler was swept about two miles down stream, and the fair presumption is that Whaling's body was not recovered. This leads to the further presumption, since it is the one consistent with good faith and honesty on the part of Eichler, that Whaling was on the train and had himself used the pass. Nor is there anything unnatural or unreasonable in this inference, for it is not at all improbable that Whaling may have entrusted his pass to Eichler for safe-keeping. It is perfectly reasonable to infer that if Whaling was on the train he himself used his pass; any other inference would be a strained and unnatural one. At all events this inference is the one that best comports with the theory of honesty and good faith, and the jury did not do wrong in adopting it, for any other theory would require the presumption that Eichler had stolen the pass, or that both he and Whaling were guilty of fraud.

The inference, for it can not with justice or accuracy be called a presumption, arising from the fact of finding the pass in Eichler's pocket after his death, is a special one; while the presumption of good faith is a general one. The court may instruct the jury that the presumption is in favor of good faith and honesty, but it could not rightfully instruct, as matter of law, that the fact that the pass was found in Eichler's pocket created a presumption that it was fraudulently used, and this proves that the inference must give way before the general legal presumption. But if we grant that the fact that the pass was found in Eichler's pocket creates a presumption, and that there is a conflict of presumptions, still the one in favor of good faith is the stronger, and will break down the other.

In *Potter* v. *Titcomb*, 7 Maine, 302, 309, there was a conflict of presumptions, and it was held that a presumption in favor of good faith would outweigh a presumption of payment. Where a party is found in possession of a document, the presumption is that he came by it fairly. *Hazen* v. *Henry*, 6 Ark. 86. The general principle runs through all the law, that

where the facts of a case are consistent both with honesty and dishonesty, the courts will adopt the construction which is in favor of honesty. *Greenwood* v. *Lowe*, 7 La. Ann. 197; *Bradish* v. *Bliss*, 35 Vt. 326. It can not, therefore, be justly held that the jury erred in acting upon the general presumption in favor of honesty and good faith, since a presumption, until overcome, makes a *prima facie* case.

The complaint, with great and, perhaps, unnecessary particularity, describes the negligence which it is alleged caused the death of Eichler, and it is contended that the evidence fails to prove the specific acts of negligence charged. We do not think the doctrine that matters of description must be strictly and fully proved applies to the allegations of negligence in actions against carriers to recover for injuries resulting from negligence. In such cases it is sufficient if the substance of the issue is proved.

It is sufficient to prove the substance of the issue as to the payment of fare, without proving specifically that it was paid in the precise manner and form alleged. The important question is as to the payment of fare as demanded by the carrier, and not as to the character of the payment. But in this instance there was evidence fully warranting the inference that the appellee's intestate had paid his fare in the manner and form described in the complaint. The conductor had recognized him as a passenger, and had given him a check, indicating that he was a passenger, and he had been carried for many hours and many miles as a passenger. The authorities go further than we are required to in this case, for, as stated by an author of a standard work upon carriers, " Every person being carried upon a public conveyance, usually employed in the carriage of passengers, is presumed to be lawfully upon it as a passenger." Hutchinson Carriers, section 554. Another author says: " It is said that payment of fare will be presumed to have been made according to the common course of business upon the route. And, although this has been

questioned, it is certain that such an inference, as matter of fact,. will be very obvious, in the case of passengers upon railroad trains, and we do not perceive any reasonable objection to the rule as one of presumption of fact which for its force must depend upon circumstances, to be judged of by the jury." Redf. Carriers, section 134.

The skill and care required of railway carriers of passengers, as is well known, are very great; they are required, as this court has said, to " exercise the highest degree of care to secure the safety of passengers, and are responsible for the slightest neglect, if an injury is caused thereby." *Jeffersonville R. R. Co.* v: *Hendricks*, 26 Ind. 228. This doctrine has often found approval in our decisions, and has often been stated by other courts in much stronger terms. *Louisville, etc., R. R. Co.* v. *Kelly*, 92 Ind. 371 (47 Am. R. 149); *Terre Haute, etc., R. R. Co.* v. *Buck*, 96 Ind. 346, see p. 356 (49 Am. R. 168). This principle, as the decided cases with much harmony affirm, applies to the machinery, track and bridges. of the railway. *Bedford, etc., R. R. Co.* v. *Rainbolt*, 99 Ind. 551; *Cleveland, etc., R. R. Co.* v. *Newell*, 104 Ind. 264. But, while the degree of care and skill required is very great, still the carrier is not an insurer of the safety of the passenger,. and is not answerable for injuries resulting from an occurrence against which human foresight and prudence can not guard. If the accident is one which human care and skill could not foresee or guard against, there is no liability.. Where, however, a passenger, rightfully on the train, is injured by the breaking down of a bridge, the presumption is that the carrier was guilty of negligence. This settled rule proceeds upon the theory that it is within the power of the carrier, and not within that of the passenger, to fully show the cause of the injury. *Pittsburgh, etc., R. R. Co.* v. *Williams*, 74 Ind. 462; *Memphis, etc., Packet Co.* v. *McCool*, 83 Ind. 392. (43 Am. Rep. 71); *Terre Haute, etc., R. R. Co.* v. *Buck,.* *supra*, see p. 358; *Bedford, etc., R. R. Co.* v. *Rainbolt,.* *supra; Cleveland, etc., R. R. Co.* v. *Newell, supra.*

Applying to the case before us these settled principles, we do not think it can be said that the verdict is not supported by the evidence upon the question as to the manner in which the bridge was constructed and maintained, for there is evidence that there was negligence in this respect on the part of the appellant, and we can not say that either the presumption which the law creates in favor of the appellee, or the testimony adduced by him, was overcome by the evidence introduced by the appellant.

Where a bridge is weakened by a sudden and unprecedented flood, and there is no time or opportunity for inspecting it and ascertaining its condition, the railway carrier is not responsible for an injury resulting from its giving way beneath a train run with proper care and skill. If it is apparent to those in charge of a train that the track and bridges have been made unsafe by tempests or floods, the trains must be run with a care proportioned to the known danger. If there is time and opportunity for inspecting and discovering the unsafe condition of a bridge after a great flood, and care and prudence require such an inspection, then the duty of making it, and, if the inspection reveals the unsafe condition of the structure, of warning approaching trains, rests upon the railway company. The duty of the company is to employ the highest degree of practical care to guard against accidents, and where its agents or officers have knowledge that a great storm or a great flood has probably made its track or bridges unsafe, it must, where there is reasonable time and opportunity, take measures to protect its passengers from injury. Whart. Neg., section 634 ; 2 Redf. Law of Railways, section 192 ; *Hardy* v. *North Carolina, etc., R. R. Co.,* 74 N. C. 734 ; *Great Western R. W. Co.* v. *Braid,* 1 Moore P. C. N. S. 101 ; *Railroad Co.* v. *Halloren,* 53 Texas, 46 (37 Am. R. 744).

The rule declared in such cases as *Pittsburg, etc., R. W. Co.* v. *Gilleland,* 56 Pa. St. 445, *Flori* v. *City of St. Louis,* 69 Mo. 341 (33 Am. R. 504), and *Livezey* v. *Philadelphia,*

64 Pa. St. 106 (3 Am. R. 578), does not apply to an action by a passenger against the carrier, for, in those cases, the relation of carrier and passenger did not exist, and the rule is that a railway carrier owes a much higher duty to passengers than to land-owners along the line of its road.

The case of *Ellet* v. *St. Louis, etc., R. W. Co.*, 76 Mo. 518, is not in conflict with the views we have expressed; on the contrary, it is in harmony with them, for it was there said: "It is quite apparent from the foregoing statement of facts, that the death of Ellet resulted from a sudden and unknown weakening of the track of the defendant by an extraordinary and unprecedented rain storm." The decision in *Nashville, etc., R. R. Co.* v. *David*, 6 Heiskell, 261 (19 Am. R. 594), can hardly be considered as in point, as the rule respecting carriers of goods is more strict than that governing carriers of passengers, although the language there used applies here, but its application is against the appellant, for it was said: "The true rule should have been stated to be, that if the parties had any reason, in the situation the company occupied, to anticipate that such a flood was about to occur, then it was the duty of the company to use actively and energetically all means at its command, or that might reasonably be expected of a company engaged in their business to possess, to meet the emergency."

The cases cited by appellant are, therefore, far from maintaining that carriers are exculpated from liability in cases where there is reasonable time and opportunity to guard against the results of an extraordinary flood, and proper care and skill are not exercised. In the case before us, it can not be said that there is no evidence that the appellant was not negligent in omitting to take proper precautions to discover the unsafe condition of the bridge, and warn the train in which the appellee's intestate was a passenger. It appears in evidence that farmers in the vicinity, hours before the accident, had knowledge from the indications about them of the probability of a great flood; some of them remained up all

night to guard against it, and some of the agents of the appellant were not far distant from the bridge, and might, it is fairly inferable from the evidence, have discovered its unsafe condition and given warning to approaching trains, for the evidence shows that the bridge was unsafe hours before the train reached it. Nor can we say that the evidence does not justly warrant the inference that those in charge of the train were informed by the appearance of the water about the bridge, that it was unsafe, and that, notwithstanding this information, they took the train upon it at a dangerous and improper speed.

Thus far, in following the line of counsel's argument, we have tacitly conceded that the bridge was safe as against an ordinary flood, but this concession can not be justly made, as there is evidence strongly tending to prove that the bridge was not so constructed as to resist even usual floods. The evidence shows that the bridge was sometimes covered with water in times of freshets, and such a bridge can not, as matter of law, be pronounced a safe one. Nor can it be said that the increased volume of water caused the bridge to give way, for the evidence fully warrants the conclusion that freshets no greater than those which had formerly swelled the river beyond its banks would have made it unsafe. We can not, therefore, assume, in the face of the verdict, that the bridge was sufficient as against ordinary floods, nor can we assume that the increase in the height of the water caused the bridge to weaken and give way. The evidence does not justify us in disregarding the finding of the jury upon this point, for, so far is it from having this effect, that it inclines us strongly to the opinion that the jury's conclusion upon this point was the only correct one. To the assistance of the evidence arises the presumption, of which we have already spoken, that the accident was due to the negligence of the carrier. In a case very like the present, the jury were instructed that, " Where the passenger is injured by any accident arising from a collision or defect in machinery, he is required,

in the first place, to prove no more than the fact of the accident and the extent of his injury; that a *prima facie* case is thus made out, and the *onus* is cast upon the carrier to disprove negligence; that, in the case trying, the legal presumption was that the injuries to the plaintiff were caused by the negligence of the defendant, and that this presumption continued until a countervailing presumption of fact was established." In commenting upon the instructions, it was said: "Now, we must say, the able argument of the learned counsel to the contrary notwithstanding, that a better summary of the law governing cases of this kind could scarcely have been framed." *Philadelphia, etc., R. R. Co.* v. *Anderson*, 94 Pa. St. 351 (39 Am. Rep. 787). It was said in another case: "Nay, the mere happening of an injurious accident, raises, *prima facie*, a presumption of neglect, and throws upon the carrier the *onus* of showing it did not exist." *Laing* v. *Colder*, 8 Pa. St. 479. In the case of *Delaware, etc., R. R. Co.* v. *Napheys*, 90 Pa. St. 135, the court said: "A *prima facie* case of negligence is thus made out, and the *onus* is cast upon the carrier to disprove negligence." This presumption, combined with the facts developed by the evidence, gives the verdict of the jury upon the point under *immediate discussion* fair support, and a long and firmly settled rule forbids us from disturbing it.

Some minor questions require consideration. One of these grows out of the exclusion of the testimony of John C. Lawler. Mr. Lawler did testify as a witness, and as the specification in the motion for a new trial is the general one that the court erred in excluding his evidence, no question is presented for our consideration. A general specification is not sufficient; the particular testimony excluded must be specified with reasonable certainty. *McClain* v. *Jessup*, 76 Ind. 120; *Marsh* v. *Terrell*, 63 Ind. 363; *Coryell* v. *Stone*, 62 Ind. 307; *Grant* v. *Westfall*, 57 Ind. 121; *Ball* v. *Balfe*, 41 Ind. 221.

The Louisville, New Albany and Chicago R'y Co. v. Thompson, Adm'r.

Our cases recognize the doctrine that where there is no evidence upon a point covered by a special interrogatory propounded to the jury, they may so answer. *Maxwell* v. *Boyne*, 36 Ind. 120; *Gulick* v. *Connely*, 42 Ind. 134; *Rowell* v. *Klein*, 44 Ind. 290 (15 Am. R. 235); *Mitchell* v. *Robinson*, 80 Ind. 281 (41 Am. R. 812); *Williamson* v. *Yingling*, 80 Ind. 379. Under this rule the answers to all the material interrogatories were proper.

The third interrogatory is: "What did the deceased represent his name to be to said conductor?" and the answer was: "No evidence." Of this counsel say: "An inspection of the record will show this answer to be evasive and untrue— a mere subterfuge."

We have carefully studied the record and can not find that there is evidence that any representation whatever was made to the conductor, for we do not believe that the mere fact that the pass issued to Whaling was found in Eichler's pocket can be deemed evidence that he made any representation to the conductor.

The fourth interrogatory is: "Was the conductor deceived by such representation?" If no representation was made we can not perceive that the jury did wrong in answering that there was no evidence upon that point.

What we have said of these two interrogatories applies to the fifth, for it rests upon the same assumption that they do. The answer to the sixth interrogatory is perhaps wrong, for, according to the answer to the first, the answer should have been "No," but the error of the jury in this particular could not possibly have injured the appellant.

Where there is no material error, there can be no reversal. The answers to all the other interrogatories were proper, and the appellant has no cause to complain of them.

The truth or falsity of answers to interrogatories is not presented by a motion to compel the jury to make them more specific, nor is it presented by a motion for a *venire de novo*.

It is obvious that the court can not direct the jury how they shall decide disputed questions of fact.

Judgment affirmed.

Filed June 17, 1886.

## On Petition for a Rehearing.

ELLIOTT, C. J.—An earnest and able petition for a rehearing has been filed, and it is thought proper to again discuss some of the questions argued.

We said in our former opinion, that even if it were conceded that the widow of Andrew Eichler was not a competent witness, no material error was committed in permitting her to testify, and we still adhere to that view; but we are prepared to go further, and hold that she was a competent witness, for the statute does not apply to cases of tort resulting in the death of the husband.    Neither section 498 nor section 499 of the code applies to a case like this, for the widow is not a party to the record, nor is her interest adverse to the estate, and the case is not one between heirs.   The case is not "founded on a contract with or demand against the ancestor," or "to obtain title to or possession of property, real or personal," but is an action to recover damages for a tort causing the ancestor's death.

The circumstances proved by the appellee show that Andrew Eichler was on the appellant's train, and was killed by the falling of the train into the river.    It is not necessary in any case, civil or criminal, that the material facts should be established by direct evidence.    Greenleaf thus states the rule which prevails in civil cases: "In civil cases, it is sufficient if the evidence, on the whole, agrees with and supports the hypothesis which it is adduced to prove."   It is also said by this author, that it is the duty of the jury " to decide in favor of the party on whose side the weight of evidence preponderates, and according to the reasonable probability of truth."
1 Greenl. Ev., section 13a. This rule has been often approved by this court. *Indianapolis, etc., R. R. Co.* v. *Collingwood,*

71 Ind. 476; *Indianapolis, etc., R. W. Co.* v. *Thomas*, 84 Ind. 194; *Terre Haute, etc., R. R. Co.* v. *Buck*, 96 Ind. 346, see p. 363 (49 Am. R. 168); *Hedrick* v. *D. M. Osborne & Co.*, 99 Ind. 143, see p. 147; *Evansville, etc., R. R. Co.* v. *McKee*, 99 Ind. 519, see p. 525 (50 Am. R. 102); *Union Mutual L. Ins. Co.* v. *Buchanan*, 100 Ind. 63, see p. 72; *Evansville, etc., R. R. Co.* v. *Mosier*, 101 Ind. 597; *Riehl* v. *Evansville Foundry Ass'n*, 104 Ind. 70.

The reasonable probability , and, indeed, the only fair inference, from the facts and circumstances established, is that Eichler was on the train which went down into Blue river. He was in Chicago, and was expected home in Louisville about the time of his death; his route was over the appellant's road; his body was found about one and one-half or two miles down stream; his name was on the tab of his shirt, and in his pocket, among other things, was a conductor's check, issued by the conductor of the train; bodies were seen washing down the river immediately after the train went down; the river was very high and the current swift; seven persons besides Eichler lost their lives by the disaster. When Eichler's body was taken from the water it was found to be badly mangled; the " head was," as one of the witnesses said, " caved in and his bowels torn out." Another witness says " the body was badly torn up, right leg broken, his hip was broken and his belly torn open;" timbers floated down stream from the bridge, displaced by the cars crashing through them.

These circumstances unmistakably show that Eichler was violently killed and horribly mangled by some means, and the most natural inference in the world is that he was killed by the train's plunging through an unsafe bridge, as were seven others who were on the train, and this supplies ground for inferring that he was on the train; but, in addition to this, are the other facts that he was in Chicago and expected home, and had a conductor's check in his pocket. There is not one particle of evidence tending to show that he was, or could have been, injured in any other way than by the train

in which he was seated falling through the defective bridge; but it is the most natural and reasonable of inferences to conclude that he was mangled and killed by the fall of the train, which, running, as it was, at a high rate of speed upon the bridge, crushed it beneath its force and weight. That the body was found some distance from the bridge does not invalidate this inference, for it is in the highest degree probable that a body mangled as was Eichler's would have been carried down by a river swollen by a great freshet. It is indeed almost inconceivable that Eichler was killed in any other manner than by the train's plunging through the bridge and crushing him between the timbers or iron of the cars and the heavy beams and sills of the bridge, so that the evidence not only supports the hypothesis of the appellee, but goes very far towards excluding any other hypothesis, if, indeed, it does not go to the full extent of excluding every other.

We conclude, without doubt or hesitation, that the evidence shows that Eichler was on the train, and the authorities cited in our former opinion abundantly prove that one who is on a train used for carrying passengers is, in the absence of countervailing evidence, presumed to be rightfully there as a passenger.

The counsel assume as true, that the complaint is for a breach of contract, and there are some statements in it which possibly give some support to this assumption, but the complaint, judged, as all our cases agree it must be, by its general scope and tenor, is very plainly in tort, and the cause of action is the negligence of the appellant.

We do not think that the complaint assumes to state as a cause of action, that the death of appellee's intestate resulted from a breach of contract, and it is very evident that the appellant's counsel tried the case upon a theory very different from that now insisted on, which is that the action was based on a breach of contract. As the case was tried upon the theory that the cause of action alleged was the negligence of the appellant, that theory prevails here. *Carver*

v. *Carver*, 97 Ind. 497. But we think it very clear that the complaint charges, as the cause of action, the tortious negligence of the appellant, and it. was not necessary to do more than prove the appellant's duty, its negligent breach, and that the deceased was free from contributory negligence, for it is an elementary rule that it is sufficient if the substance of the issue be proved.

It is quite probable, so much so that the jury were authorized to infer it, that the deceased purchased a ticket at Chicago, for there is no evidence to the contrary, and the conductor testified that he did take up "tickets, passes and coupons." We say that it was fairly inferable that the deceased had a ticket, because as the authorities cited in our former opinion establish, one on a passenger train is presumed to be rightfully there as a passenger, and because the presumption is always in favor of honesty and fair dealing. Any other rule would work great hardship in such a case as this, where the lips of the passenger are closed in death, and where the ticket, if bought at all, was bought at a station in a great city, where many passengers purchase tickets and embark upon the trains of the railway company.

We do not deem it necessary or proper to again discuss the question of presumptions in favor of Eichler's honesty, further than to say that it was presumably in the power of the appellant to show who Whaling was, why the pass was issued to him, and what had become of him. As we said in our former opinion, the pass issued by the appellant showed to whom it was issued and on whose account, and no explanation at all was offered, nor was the part of the pass which the conductor testified that he took up given in evidence. We think these facts called upon the appellant to explain, and will not allow it to succeed solely on an inference, which it is claimed exists, that Eichler fraudulently procured and used the pass issued to Whaling.

Mr. Broom says: "Where a party has the means in his power of rebutting and explaining the evidence adduced

against him, if it does not tend to the truth, the omission to do so furnishes a strong inference against him." Broom. Legal Max. 939.

Petition overruled.

Filed Nov. 22, 1886.